**UNITED STATES STEEL CORPORA-TION, and Carnegie Natural Gas Company, Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

Central Illinois Public Service Co. et al., Intervenors.

No. 74–2117.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 12, 1975.

Decided March 24, 1976.

Rehearing Denied June 15, 1976.

---

Max O. Truitt, Jr., Washington, D. C., with whom Alan S. Weitz, Cary B. Lerman, Washington, D. C., and Wayne L. Emery, Pittsburgh, Pa., were on the brief, for petitioner United States Steel Corp. and also argued for petitioner Carnegie Natural Gas Co.

Allan Abbott Tuttle, Solicitor, F. P. C., Washington, D. C., for respondent. Drexel D. Journey, Gen. Counsel, F. P. C., John R. Staffier and William J. Grealis, Attys., F. P. C., Washington, D. C., were on the brief, for respondent.

Tilford A. Jones, Edward H. Gerstenfield, Bethesda, Md., and Gregory B. McBride, Silver Spring, Md., were on the brief for petitioner Carnegie Natural Gas Co.

J. Richard Tiano and James K. Mitchell, Washington, D. C., were on the brief for intervenors Arkansas-Missouri Power Co., Associated Natural Gas Co., Central Illinois Public Service Co., and Mississippi Valley Gas Co.

Barbara M. Gunther and James P. Slattery, Brooklyn, N. Y., were on the brief for intervenor The Brooklyn Union Gas Co.

Edward J. Grenier, Jr., Richard P. Noland and Richard J. Pierce, Jr., Washington, D. C., were on the brief for intervenor General Motors Corp.

Francis J. McShalley, Washington, D. C., entered an appearance for intervenor Algonquin Gas Transmission Corp.

Platt W. Davis, III, Washington, D. C., entered an appearance for intervenor Texas Eastern Transmission Corp.

Before TOM CLARK,* Associate Justice of the Supreme Court of the United States, and ROBINSON and MacKINNON, Circuit Judges.

Opinion for the court by Mr. Justice CLARK.

Mr. Justice CLARK:

Once again the application of Federal Power Commission Order No. 467 and its progeny are under attack. This time the attack is brought by United States Steel Corporation (USS) and its wholly owned subsidiary, Carnegie Natural Gas Company (Carnegie), petitioners. Carnegie, a gas distribution company, purchases gas for resale to USS for use in the latter's ammonia and steel producing facilities in the Monongahela Valley, more particularly its anhydrous ammonia plant at Clairton, Pennsylvania, and its steel-making operations at Homestead, Duquesne, Cristy Park and Irvin Works. Carnegie buys its gas from Texas Eastern Transmission Corporation (TETCO) on a firm contract, but shortages in gas made it impossible for TETCO to fill its contractual obligations.

1. *Action by the FPC*

The FPC responded to the recent gas shortage problem by issuing "statements of policy" initially in Order No. 431 (April 15, 1971), followed by Order No. 467 (January 8, 1973), Order No. 467–A (January 15, 1973), Order No. 467–B (March 2, 1973), and Order No. 467–C (April 4, 1974). We will refer to the four latter orders as 467. "Order No. 431 hinted that curtailment priorities should be based on the end use of the gas and stated that curtailment plans approved by the Commission 'will control in all respects notwithstanding inconsistent provisions in [prior] sales contracts . . . .' " *Pacific Gas Electric Company v. Federal Power Commission*, 164 U.S.App. D.C. 371, 506 F.2d 33, 35 (1974). Subsequently a variety of plans were submitted to the FPC for approval, some based on end use of the gas and others on contract entitlements. The resulting confusion led to the issuance of Order No. 467 by the FPC without prior notice or opportunity for comment. The criterion adopted in it is the end use of the gas. The history of Order No. 467 and its predecessor orders is fully traced by Judge MacKinnon in *Pacific Gas Electric Company, supra,* and by Chief Judge Bazelon in *Consolidated Edison Co. of New York, Inc. v. FPC*, 168 U.S.App.D.C. 92, 512 F.2d 1332 (1975).[1]

Pursuant to Order No. 467, TETCO revised its tariff sheets to incorporate in its curtailment procedures the new FPC policy. These filings were noticed by the FPC on July 16, 1973, and the date for filing protests or interventions therein was fixed at July 30, 1973. On August 30, 1973, the FPC accepted TETCO's tender, and the tariff was filed but suspended for one day and permitted to become effective September 2, 1973, pending a hearing under Section 4 of the Act. This hearing is still in progress.[2]

---

* Sitting by designation pursuant to Title 28 U.S. Code Section 294(a).

1. Perhaps one comment should be made in light of the claim of petitioner that notwithstanding the fact that the pro-rata curtailment plan under Order No. 431 was approved December 1, 1972, as being just and reasonable and in the public interest, the FPC later reversed itself without notice or hearing and issued Order No. 467 announcing a policy based upon end use criteria. USS fails to state that the pro-rata curtailment was merely an "interim settlement" and was specifically so titled by the FPC. In addition, the end use criteria were "hinted" in Order 431 itself, and TETCO was ordered to file tariffs under the FPC's Order No. 467 on the rehearing of the Order 431 pro-rata criteria approval. The claim is frivolous.

2. Docket Nos. RP 71–130 and RP 72–58 involve the validity of these filings. Neither USS nor Carnegie protested the filings, and no challenge to the FPC Order accepting the filings has been made, although various petitions to intervene and protest were timely filed. Carnegie filed a petition to intervene on October 2, 1973, and USS filed a similar petition on October 19, 1973, each over 60 days late. Indeed, USS did not move to intervene here until after Opinion No. 716 of the FPC had been entered.

Carnegie immediately sought relief from this curtailment order which cut its 58,000 Mcf per day contract deliveries to 35,189 Mcf daily on November 1, 1973.[3] On November 6, 1973, a complete shutdown of USS's ammonia plant followed. On November 21, 1973, Carnegie filed a Petition for Emergency Relief from TETCO's end use curtailment plan. Carnegie requested minimum deliveries of 45,240 Mcf daily, and on November 30 the FPC granted the emergency petition. On December 28th, the matter was set for hearing. At the hearing before an Administrative Law Judge, Carnegie offered various exhibits and testimony by eight witnesses, while in opposition testimony was offered indicating that certain turbine compressors at the ammonia plant of USS should be converted to oil, affording a daily saving of 16,000 Mcf of gas. Carnegie countered all the the testimony, but the Administrative Law Judge found 41,240 Mcf daily sufficient for USS present needs: 28,000 Mcf for the ammonia plant, 1000 Mcf daily for six soaking pits, and 12,240 Mcf daily for the steel mill. Certain conditions were laid down. First, there was to be payback of volumes received in excess of the normal operation of TETCO's curtailment. Second, the gas turbines and compressors at the ammonia plant were to be converted to oil to save 16,000 Mcf daily, which conversion would occur not later than December 31, 1974, as to the turbines, and not later than August 31, 1975, as to the compressors.

On December 16, 1974, the FPC entered its Order and Opinion 716. It found that Carnegie had not demonstrated sufficiently that it had exhausted all means of obtaining additional supplies of fuel other than gas, and that the finding of 12,240 Mcf daily for steel-making was not justified. The FPC also held that the four turbine gas compressors at the ammonia plant must be converted to an alternate fuel by August 31, 1975 (later delayed to December 16), at which time gas deliveries were to be re-

duced by 16,000 Mcf daily. Finally, the FPC held that the payback requirement of the Administrative Law Judge was to operate during both curtailment and non-curtailment periods. Later, it refused to re-open the record and on January 9, 1975, denied a rehearing, holding with reference to the availability of alternate fuels that Carnegie's showing was deficient in that: (1) the record was unclear as to whether USS could secure additional gas from another USS supplier, The Peoples Gas Company; (2) Carnegie had offered no definitive deliverability study as to its own gas wells, demonstrating that it had maximized production to the greatest extent; (3) no definite showing was made that Equitable Gas Company could not increase its deliveries or secure extraordinary relief from Tennessee Gas Pipeline Company, its supplier; (4) USS had not explored an exchange arrangement with other TETCO customers to secure more gas; and, (5) conversion to alternate fuels had not been proven infeasible. Each of the several motions for rehearing were denied, stays were refused by the FPC and this court, after which the Chief Justice, acting as Circuit Justice, also denied petitioners' application for stay of Opinion 716.

Before further discussion, we recapitulate what the final order of the FPC provides with reference to Carnegie's application for extraordinary relief. In round figures, Carnegie is guaranteed 21,000 Mcf of gas daily. If TETCO's normal curtailment plan operates at any time so as to give Carnegie less than 21,000 Mcf daily, the extraordinary relief granted will make up the difference. However, when the six soaking pits at USS's Thompson plant are converted, the 21,000 Mcf daily will be reduced by 1000 Mcf [the order date is August 31, 1975]; and when the four turbines and compressors at the Clairton ammonia plant are converted to oil, there will be a further reduction of 16,000 Mcf daily [the order date is December 16, 1975]. The relief granted is

3. It was reduced again to 31,376 Mcf per day on November 16, 1973, and finally to 21,249 Mcf daily on January 1, 1974.

to be increased by 4000 Mcf daily in the event of a failure in the temporary transformer circuit providing purchased power at the Clinton ammonia plant and also on one day per week when preventive maintenance is being performed. However, all extraordinary relief is to be discontinued when TETCO is actually curtailing deliveries into Priority I [residential and small commercial establishments] of its curtailment plan. Finally, of course, Carnegie is subject to the payback as described in the Order.

### 2. *Contentions of the Petitioners*

(a) The petitioners urge that: (i) the tariff of TETCO imposed on them is unlawful because the priorities established are supported only by those of Order No. 467 and not by record evidence; (ii) neither the FPC nor any participant to the proceeding adduced any evidence in support of Order No. 467 or its priorities; and, (iii) the FPC merely assumed the validity of the priorities of Order No. 467 and imposed upon petitioners the burden of proving the contrary, with the result that when the petitioners failed, the FPC then held against them. The Supreme Court, however, has held that the FPC has authority to regulate the curtailment practices of pipelines under its "transportation" jurisdiction, Section 1(b) of the Natural Gas Act, 52 Stat. 821, 15 U.S.C. § 717. *FPC v. Louisiana Power and Light Co.*, 406 U.S. 621, 638, 92 S.Ct. 1827, 1837, 32 L.Ed.2d 369, 383 (1972). The Court further held that: "the Commission must possess broad powers to devise effective means to meet these responsibilities." *Id.* at 642, 92 S.Ct. at 1839, 32 L.Ed.2d at 386. The Court upheld the predecessor to Order No. 467, i. e. Order No. 431, holding that the FPC must be granted maximum latitude under Section 4 of the Act to the end that:

> [w]hen emergency or other conditions arise and it appears desirable in the public interest to place a plan into effect, the

FPC may accept the filing, implement it immediately or suspend it, and employ the plan as a working guideline while hearings continue. *Id.* at 645, 92 S.Ct. at 1841, 32 L.Ed.2d at 388.

The FPC did here exactly what the Supreme Court approved in *Louisiana Power and Light Co., supra,* and no more.[4] It may be said that FPC action on the validity of TETCO's plan, pending in Docket Nos. RP 71–130 and RP 72–58, is being unduly delayed, but as of this date no such charge has been made, and it is not for us to raise it.

We, therefore, conclude that neither Order No. 467 nor TETCO's curtailment plan is in issue here. *Texas Gulf, Inc. v. FPC*, 494 F.2d 789 (5th Cir. 1974). Those issues are involved in Docket Nos. 71–130 and RP 72–58 where they will be decided in due course.

(b) Next petitioners say that the FPC failed to articulate in advance the relevant issues that petitioners must meet in their emergency relief application and the quantum of proof required. One seeking relief usually has the burden of proving his entitlement thereto. Here the issue had to do with the curtailment of Carnegie's gas supply from TETCO. As the FPC said in Opinion 716, "a petitioner for extraordinary relief should demonstrate no alternate fuel is available. This strict standard applies *a fortiori* to alternate sources of supply." This requirement is so obvious that it does not require articulation. Indeed Order No. 467 made it clear that "extraordinary circumstances" must be proved to secure an exception. To obtain the relief, petitioners were required to answer the obvious question: "Can the energy required be secured from other sources?" Answering the question is patently required as part of the request Carnegie made. But if this is not true, then Carnegie should have asked for clarification. USS cites *American Louisiana Pipe Line Co. v. FPC*, 120 U.S.App.D.C.

---

**4.** We also point out that Chief Judge Bazelon in *Consolidated Edison Co. of N. Y., supra*, 512 F.2d 1332, held that the FPC "has a responsibility to monitor whatever interim plan may be in effect pending a final decision and to make such adjustments as may appear warranted." *Id.* at 1343. The record shows that the FPC has met that responsibility here. Also see *Texas Gulf Inc. v. FPC*, 494 F.2d 789, 792 (5th Cir. 1974).

140, 344 F.2d 525 (1965) and *Hill v. FPC*, 335 F.2d 355 (5th Cir. 1964) in support of its position. Neither is apposite. We find that the analysis in the *Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968) sheds more light on the matter. Like maximum rate-fixing, natural gas curtailment was not only somewhat new, but it was entirely experimental and required a case by case development. Here the FPC applied broad standards in *United Gas Pipe Line Company*, Docket RP 71–29 and RP 71–120, 50 FPC 1743, 1744–1745; *Panhandle Pipe Line Company*, Docket RP 71–119, 50 FPC 1875, where it indicated relief was in order if the applicant demonstrated it had "exercised all prudent measures for obtaining alternate fuel capabilities." Moreover, the record shows that petitioners were aware of the nature of the proof necessary, such as the production potential of its wells, the ability to secure additional gas from other suppliers, or through exchange or displacement arrangements, and the use of alternate fuels. The fault is not with the FPC but with petitioners in failing to put on their proof in support of their contentions. They knew that they had the burden of justifying their request for extraordinary relief, *Pacific Gas and Electric Company v. SEC*, 127 F.2d 378, 382 (9th Cir. 1942), yet they did not come forward with available evidence, evidence which was quickly and easily obtainable, such as the study General Electric made on conversion of USS's gas turbines, and the use of TETCO's gas in summer and alternate fuels in winter. Indeed, it appears that the reason petitioners failed to bring on the testimony was because it was either weak or harmful to their case.

■ (c) Third, petitioners attack the findings of the FPC, claiming that they are not supported by any evidence, are contrary to all of the evidence in the record, and are therefore arbitrary and capricious. There is much hue and cry to this claim, but alas there is no wolf. Even one who runs while he reads would find substantial support in the record as a whole for the FPC findings. Perhaps petitioners do not realize the heavy burden that they bear in seeking relief from applicable curtailment tariffs. *See WAIT Radio v. FCC*, 135 U.S.App.D.C. 317, 418 F.2d 1153, 1157 (1969). Petitioners alone had access to all of the facts with which to justify the granting of extraordinary relief, but they chose not to come up with them. For example, on the availability of alternate fuels, no oil supplier was contacted, no effort was made to seek an assignment of a base period volume from the federal energy office, and only one witness was used to establish a scarcity in fuel oil supply. Although gas fuel for turbine use has a low priority, Carnegie reported its usage as Priority 2, which is for food stock, process and plant protection, a much higher priority than turbine usage. Still it made no explanation. One of USS's gas suppliers was Peoples Natural Gas but rather than seeking aid from it, Carnegie admitted its scouts had not seen Peoples "in recent years." Likewise Carnegie's Chief Engineer testified that he had not considered an exchange of gas with Peoples. Even as to its own wells, petitioners failed to prepare any availability study on its own production. USS says such a study is "irrelevant", and Carnegie says it would be "superfluous" since it has sufficient pipeline and production is at its height. The record indicates that Carnegie produces some 11,000 Mcf daily from its own wells, but there was no showing that its limitations on production was related to the potential of the wells or the size of the pipeline. Moreover, the record shows only 7500 Mcf daily from Carnegie's local production when it has been producing 11,300 Mcf daily. In June, 1973, production was 15,000 Mcf daily. These inconsistencies were never resolved. Nor did petitioners reconcile the fact that Equitable Gas, one of USS's suppliers, was furnishing an average of 21,000 Mcf daily in 1973 (with a high of 37,000 Mcf in September 1973) with its average of 19,300 Mcf daily at the time of the hearing. Petitioners concede a deficiency in their record, in that they never attempted to secure more gas through a displacement or exchange arrangement with other TETCO customers or any other of its suppliers. Nonetheless they say such a requirement is unreasonable

as well as irrelevant.[5] However, if it is to claim that all alternate sources have been explored, USS should have checked into the feasibility of such an arrangement. Finally, although petitioners claim that converting some of USS facilities to alternate fuels is infeasible, one of its witnesses testified that a "propane-air mix could be used"; another of their witnesses testified that "with modification of equipment" acetylene, MAPP (a manufactured gas), and propane air could be used, as well as synthetic natural gas.

▪ (d) Petitioners say that the cost of conversion to other fuels is too costly and that other fuels are not available. The FPC found that it was technically feasible to convert to fuel oil, that cost alone was not a sufficient excuse for failing to make such a study, and that fuel oil was in fact available. The record as a whole includes substantial evidence supporting such findings.

▪ Nor does the proof on the record indicate that conversion cannot be accomplished until the spring of 1976 as claimed by USS. On the contrary, the testimony indicates a maximum conversion time of 18 months. Petitioners were on notice to convert as early as May 13, 1974, when the Administrative Law Judge handed down his decision. At the time of the FPC decision, the deadline of December 16, 1975, was therefore well within the estimate. In any event, if changed circumstances or other valid grounds exist for enlargement of the conversion time, the FPC has the power to grant it.

▪ (e) Petitioners further claim that the payback obligation was unreasonable, beyond the power of the FPC to create, and is based on policy considerations unsupported by the record. As the FPC found, in Opinion No. 716, payback "encourages

expeditious conversion to alternate fuels, deters exploitation of extraordinary relief, prevents an undue advantage going to the recipient of relief and partially restores volumes taken from other customers." R. 1529. In addition, the failure to require payback "would have the effect of stimulating other pipeline customers to exaggerate their initial relief requests so as to take advantage of the extraordinary relief procedure." R. 1732. USS seems to concede this but says there is no specific evidence that such objectives apply here. We find that the enormous discrepancy between Carnegie's application for extraordinary relief and the amount finally approved, is highly relevant in this regard. We find payback not only permissible but mandatory in cases such as this to protect the interests of other pipeline customers who must absorb the additional curtailment which results.

▪ As to power, certainly if FPC can give extraordinary relief in appropriate cases, it can also take away gas where justified. The Fifth Circuit so held in *Texas Gulf, Inc. v. FPC*, 494 F.2d 789 (1974), finding that it was within the sound discretion of the FPC to require Texas Gulf "to repay its overtakes from its allotment under United's curtailment program." *Id.* at 792. Significantly it went on to hold that not to require such paybacks "would completely destroy compliance . . ." *Id.* In order to protect petitioners from the dire consequences they alleged would result from TETCO's curtailment plan, FPC granted temporary extraordinary relief on their sole representations, pending a hearing and receipt of substantial evidence to support its action. After a full hearing, the FPC has decided that the relief granted was not warranted and has reduced the total amount substantially. Not only does "common sense", as the Fifth Circuit states

---

5. Strangely enough, USS in its verified motion for a stay filed on May 7, 1975, proposes that if Carnegie is released from its payback obligation, USS can "utilize Texas Eastern (TETCO) gas during the relatively plentiful summer months in lieu of the gas of its other suppliers and draw upon these other suppliers in the

winter months." This is a significant commentary on its earlier position that it knew of no other alternative supply and that extraordinary relief was the sole solution. It renders highly questionable USS's insistence that it is entitled to extraordinary relief in any amount.

in *Texas Gulf*, support a payback but common honesty commands it. Only in this manner can the windfall which petitioners have received be recouped by those who suffered its initial loss. Carnegie says this is a "penalty", but to us it is but simple restitution due those who were rightfully entitled to the use of the gas.

 (f) Carnegie also interposes such due process claims. It says that the hearing was ordered on December 28, 1973, and was set for January 16, 1974. Carnegie filed its extraordinary hardship application on November 30, 1973, and on the same date it was set for a hearing. The FPC had accepted TETCO's tender of its curtailment plan on August 30, 1973, and had permitted it to become effective on September 2, 1973. There is nothing in the record to explain why Carnegie did not file its application until 90 days later. In any event, numerous protests were filed to the FPC action granting Carnegie's requested temporary relief, and the FPC acted quickly in accord with the Act. At the time the hearing was ordered, Carnegie had known of its problem for some months; it had been granted full relief therefrom, and was aware of the emergency nature of the situation. Nonetheless, it says that it knew nothing of the setting until January 2, when the notice was found in Public Reference Room at the FPC offices. Counsel requested a two-weeks extension and was granted a six-day one on the preparation of evidence and a two-day delay on the hearing. At the beginning of the hearing, counsel for Carnegie stated that the case he was presenting was "not the case I would have presented had I had time to interview witnesses, or even contact witnesses, and put a full case together . . . So the best I could do was to put together a smattering of evidence . . ." However, Carnegie put on eight witnesses from seven different companies in five states and the District of Columbia. There was no effort to extend the hearings, and although the FPC had the matter under advisement for almost a year, no effort was made to reopen the case or offer additional testimony, save on the environmental issue which was denied in FPC

Opinion No. 716. Since the environmental claim entailed solely a question of law, there was no necessity for a hearing upon it. Under these circumstances and in light of the record, we cannot say that petitioners were denied due process.

 (g) Nor was FPC required to file an impact statement under the National Environmental Policy Act (NEPA) as petitioners allege. *See Consolidated Edison Company of New York Inc. v. FPC, supra,* at 1346; *American Smelting and Refining Co. v. FPC,* 494 F.2d 921 (3 Cir. 1974); *Atlanta Gas Light Company v. FPC,* 476 F.2d 1942 (5th Cir. 1973). It follows that such statements are not required with respect to interim grants or denials of extraordinary relief. We need not pass on whether petitioners will have to file such a statement before converting their facilities.

(h) The remaining claims of petitioners are frivolous and are denied.

*Affirmed.*