Edwin I. HATCH, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

No. 80-1561.

United States Court of Appeals, District of Columbia Circuit.

Argued April 30, 1981.

Decided June 26, 1981.

James M. Brachman, New York City, of the bar of the Supreme Court of the United States pro hac vice by special leave of court with whom John P. Meade and Eliot J. Halperin, Washington, D. C., were on the brief for petitioner.

Jane C. Murphy, Atty., Federal Energy Regulatory Commission, Washington, D. C., with whom Jerome Nelson, Acting Gen. Counsel, Federal Energy Regulatory Commission, Washington, D. C., was on the brief for respondent. Joseph G. Stiles, Atty., Federal Energy Regulatory Commission, Washington, D. C., also entered an appearance for respondent.

Before BAZELON, Senior Circuit Judge, and WRIGHT and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Petitioner Edwin I. Hatch ("Petitioner") asks this court to set aside the decision of the Federal Energy Regulatory Commission (the "Commission") denying Petitioner's application for authorization to hold interlocking directorships in certain corporations.[1] Petitioner contends that the Commission acted arbitrarily and in violation of its statutory mandate under section 305(b) of the Federal Power Act ("the Act"), 16 U.S.C. § 825d(b),[2] by refusing to allow him to hold simultaneously the positions of director of a public utility and director of an entity authorized to underwrite public utility securities. Petitioner also claims that the rejection of his application was procedurally defective: that it stemmed from the Commission's adoption, after the close of the evidentiary hearing, of a new legal standard of proof, which he was given no opportunity to meet. For the reasons stated below, we hold that the standard of proof adopted in this case is consistent with section 305(b) of the Act and thus that the Commission has the discretion to apply that standard if it proffers an adequate explanation for adopting the changed standard and gives adequate notice to affected parties. However, we believe that a remand is necessary because the Commission did not, in fact, afford any clear explanation of why after forty years it decided to change the standard of proof utilized in proceedings instituted pursuant to section 305(b), and because it did not provide Petitioner an opportunity to supplement the record with evidence relevant to the new standard.

1. This case presents for review two Commission orders in Edwin I. Hatch, Docket No. ID–1424: "Opinion and Order Denying Application to Maintain Certain Directorates," issued November 6, 1979 (R. 688–699, J.A. 48–59), and "Opinion and Order Denying Rehearing," issued May 7, 1980 (R. 712–723, J.A. 60–71). "R. __" refers to pages of the record in the certificate of the record, and "J.A. __" refers to pages of the Joint Appendix filed with this court in conjunction with this case.

The Commission's May 7, 1980 Opinion and Order directed that Petitioner remove himself from certain boards of directors by June 6, 1980. On June 5, 1980 this court granted Petitioner's motion for a stay pending review of the merits. *See* note 23 *infra*.

2. When this case began, the Federal Power Commission administered the Federal Power Act. The Federal Regulatory Commission, created on October 1, 1977 under section 401 of the Department of Energy Organization Act, 42 U.S.C. § 7171, has since assumed the responsibilities of the Federal Power Commission relevant to this case. As used in this opinion, the term "Commission" refers to the Federal Energy Regulatory Commission or the Federal Power Commission, depending on whether the events referred to occurred before or after October 1, 1977.

## I. BACKGROUND

### A. *Petitioner's Application to Hold Interlocking Directorates*

Section 305(b) of the Act provides that no person can serve both as a director of a public utility and a corporation "authorized by law to underwrite or participate in the marketing of securities of a public utility" unless the Commission finds "upon due showing in form and manner prescribed by the Commission, that neither public nor private interests will be adversely affected thereby." In 1976 Petitioner filed an application with the Commission seeking authorization to hold directorships of both City Investing Company ("City Investing") and the Home Insurance Company ("Home Insurance") while continuing to serve as the Chairman of the Board of Directors and Chief Executive Officer of the Georgia Power Company ("Georgia Power"). A brief description of the corporate players follows:

1. Georgia Power, a subsidiary of The Southern Company ("Southern"), a registered holding company, is a public utility. It generates, purchases, distributes and sells electricity in the State of Georgia.

2. City Investing, through its subsidiaries, one of which is City Home Corporation, engages in diversified manufacturing, housing, insurance, and financial enterprises. In 1976, City Investing had consolidated assets of approximately $4.2 billion and revenues of approximately $2.5 billion. City Investing is not a broker or dealer of securities and is not authorized to underwrite securities.

3. Home Insurance is a wholly owned subsidiary of City Home Corporation actively engaged in the insurance business, with consolidated assets in 1976 of approximately $2.5 billion and revenues of approximately $1.3 billion. Home Insurance purchases and sells securities held for its own account, but neither engages in any activity that would make it an "underwriter" nor participates in the marketing of securities of any kind.

4. Home Capital Services, Inc. ("Home Capital") is a small corporate subsidiary of Home Insurance created in 1971 to permit Home Insurance and its affiliated companies to purchase newly owned securities at discount prices. Home Capital was, until June 1980, a broker/dealer registered with the Securities and Exchange Commission ("SEC") and is authorized to underwrite public utility securities. Home Capital's activities have been limited to selling and purchasing obligations on behalf of Home Insurance. It engaged in no transactions with the public. In 1976 Home Capital's sole underwriting venture involved New York State Housing Agency State University Construction Bonds. Home Capital's reported assets in 1976 were approximately $6.7 million and its revenues approximately $1.5 million.[3]

Petitioner was not, and is not, an officer or director of Home Capital, the only company involved here authorized to underwrite securities. In fact, Petitioner first became aware of the existence of Home Capital in 1975, whereupon he "consulted counsel and made application to the Securities and Exchange Commission and subsequently to the Federal Power Commission for authorization to maintain ... positions with City, Home, and Georgia Power." (Tr. 27, 30).[4] Because Home Capital's investment activities were attributable to its parent, Home Insurance, and grandparent, City Investing, the Commission ruled that Petitioner's directorship of these two companies brought him within the ban of sec-

---

3. Home Capital's 1976 assets represented less than 0.2 percent of City Investing's 1976 assets and less than 0.3 percent of Home Insurance's 1976 assets. Its 1976 revenues represented less than .06 percent of City Investing's revenues and approximately 0.1 percent of Home Insurance's revenues. At oral argument Peti-

tioner's counsel suggested that for the directors of City Investing and Home Insurance, the "company cafeteria" was of greater concern than Home Capital.

4. "Tr. ___" refers to pages of the transcript of the October 13, 1977 hearing before the Administrative Law Judge ("ALJ").

tion 305(b) of the Act.[5] On the basis of his initial written application, the Commission found that Petitioner "has failed to demonstrate that approval of the application filed herein will not adversely affect public or private interests," and issued an order to show cause why the application should not be denied (Order to Show Cause, issued February 18, 1977, R. 423, J.A. 3).[6] A one day evidentiary hearing before an Administrative Law Judge ("ALJ") ensued.

### B. *The ALJ's Decision*

Following the Order to Show Cause, the ALJ compiled an evidentiary record consisting of the testimony, related exhibits, and cross-examination of Petitioner and a single witness on behalf of the Commission. The evidence showed that while Petitioner had virtually no knowledge of or involvement in the underwriting activities of Home Capital, nonetheless prior to his 1976 application, Home Capital and Georgia Power, as well as Home Capital and other companies on whose boards Petitioner sat, engaged in securities transactions among themselves during his tenure as director of each corporation.[7] According to the ALJ:

It was [Petitioner's] understanding that since its formation in 1971, Home Capital has been a member (but never the lead underwriter) of seventeen syndicates underwriting municipal obligations and that participation in those underwritings has enabled Home Capital to make the purchase of new securities cheaper for other members of the Home Insurance Group by passing on to them the underwriter's discount obtained by Home Capital. It was his understanding, further, that no underwriting by Home Capital has related to Georgia Power or its subsidiaries in anyway [sic]. In 1973 Home Capital participated, to the extent of $3,500,000 in the $17,250,000 offering of Jackson County, Mississippi Water Pollution Revenue Bonds, Series 1973, due November 1, 1978. The bonds were obligations of Jackson County, Mississippi, although the source of revenue for the bonds was the Mississippi Power Company, a subsidiary of Southern. As noted earlier, Southern is a public utility holding company which owns all of the common stock of Georgia Power. That underwriting was led by E. F. Hutton & Company, Inc., the winner of the competitive bidding.

5. Section 17(c) of the Public Utility Holding Company Act, 15 U.S.C. § 79q(c), and section 305(b) of the Federal Power Act, 16 U.S.C. § 825d(b), are parallel provisions. Section 17(c) prohibits interlocking directorates between holding companies or their subsidiaries and an underwriter unless specifically excepted by an SEC rule or regulation. In May 1976 the SEC, in response to Petitioner's inquiry, informed him that under section 17(c), he was precluded from serving as a director or officer of Georgia Power while serving as a director of City Investing and Home Insurance. However, those holding interlocking director positions with a holding company or its subsidiary and an underwriting firm pursuant to Commission approval under section 305(b) are excepted from the section 17(c) prohibition. It was this exception which prompted Petitioner to seek approval from the Commission under section 305(b). (R. 442, J.A. 2).

6. In April 1978, Petitioner retired as Chairman of the Board and Chief Executive Officer of Georgia Power and thereafter served as an honorary director. The Commission held that be-

cause he performs functions similar to those of a director, Petitioner's position as an honorary director is within the purview of section 305(b) and the relevant regulations, 18 C.F.R. § 45.2. November 6, 1979 Opinion and Order, *supra* note 1, at 3–5 (R. 688, 692–94, J.A. 48, 52–54). At oral argument Petitioner's counsel indicated that this ruling is unchallenged on this appeal.

7. Petitioner's positions as director of Georgia Power, the Southern Company, Southern Company Services, Inc., City Investing Company, The Home Insurance Company, First National Holding Company, First National Bank of Atlanta and Seaboard Coastline Industries, Inc., companies with total assets in excess of seventeen billion dollars, resulted in a complicated network of interlocks. Initial Decision of the ALJ, issued February 8, 1978 at 4 (R. 561, 564, J.A. 12, 15). The ALJ found "two interlocks between the First National Bank of Atlanta and Georgia Power, two interlocks between Home Insurance and Seaboard, two interlocks between Seaboard and Georgia Power and three interlocks between Seaboard and Southern Company." *Id.*

Notwithstanding [Petitioner's] above-noted understanding, the record nevertheless shows that Home Capital has, on behalf of Home Insurance, participated in both the sale and purchase of stocks and bonds of companies of which [Petitioner] is a director, including securities of Georgia Power. For example, Home Capital participated in the sale of Southern stocks, the sale of Georgia Power bonds and in the purchase of Seaboard stocks [Petitioner was Director of Seaboard Coast Lines Industries, Inc.].

"Initial Decision of the ALJ," *supra* note 7, at 7 (R. 561, 567, J.A. 12, 18) (citations omitted).[8]

The hearing revealed no evidence, however, that Petitioner exerted any influence in Georgia Power to let Home Capital participate in the underwriting of Georgia Power's securities or vice-versa. Nor was there any evidence that anyone connected with City Investing, Home Insurance, or Home Capital ever exerted any influence on Petitioner to advance Georgia Power's use of the underwriting services of Home Capital. The activities of Home Capital were not discussed at meetings of the Board of Directors of City Investing or Home Insurance. Furthermore, at the suggestion of the Commission, after Petitioner filed his application, City Investing, Home Insurance, and Home Capital entered into an agreement providing that while Petitioner maintained his various director positions, Home Insurance and Home Capital could retain their present holdings of securities of Georgia Power and Southern, but would not engage in transactions involving any other securities of Georgia Power or Southern.

(Tr. 31–32). Initial Decision of the ALJ, *supra.*

The ALJ summarized his evidentiary findings as follows:

There is nothing in the record to indicate or even imply that [Petitioner] has abused *any* of his positions in the past and consequently, there is no reason to believe that he would do so in the future. . . . Even [the Commission's] Witness . . . conceded that he had no reason to believe that [Petitioner] was using, or would use in the future, his positions of influence to promote the financial viability of Home Capital. Finally, no support can be found in the record as would cast disapprobation upon [Petitioner's] performance of his duties as Chairman and Chief Executive Officer of Georgia Power.

Initial Decision of the ALJ, *supra* at 34–35 (R. 561, 594–95, J.A. 12, 45–46) (citations omitted) (emphasis in original).

The ALJ then, however, devoted considerable attention to the proper legal standard for weighing a section 305(b) application. After an extensive review of the legislative history of section 305(b), the ALJ stated that if he were interpreting the provision as an original exercise he would hold:

the legislators' intent was to hold interlocking directorates invidious *per se*, and that in order for the Commission to sanction an interlock placed within its discretion, substantial evidence must be presented to sustain a finding that a public benefit will flow from such interlock sufficient in magnitude to outweigh the evils inherent therein. In regard to the interlock here involved, no such evidence

---

8. The Commission's auditor testified that Home Insurance owned $5.7 million worth of common stock of Southern Company, and that this represents Home Insurance's largest public utility security holding. Home Insurance also owns $2.8 million face value of Pollution Control Bonds of Georgia Power and $500,000 of 11% Georgia Power First Mortgage Bonds. Moreover, Home Insurance of Illinois, a subsidiary company of Home Insurance, owns $200,000 of Georgia Power Pollution Control Bonds. Home Insurance owns $3.2 million of Preferred Stock of Alabama Power Company, a subsidiary of Southern. This evidence shows a substantial financial relationship between the companies on whose boards [Petitioner] serves. It is conceivable that [Petitioner] is using his positions of influence in these companies to promote this financial interconnection. Again let me state that I have no reason to believe this has or would happen; however, the general public may view this relationship in a different manner and infer that a conflict of interest exists.

(Tr. 159, R. 159, J.A. 10).

was adduced and on the basis of all of the above the application of [Petitioner] would be denied.

*Id.* at 25 (R. 561, 585, J.A. 12, 36). However, the ALJ concluded on the basis of Commission precedent going back several decades, that the application must be approved in the absence of evidence that the interlock would result in specific adverse effects. Accordingly he approved Petitioner's application subject to the condition that Home Capital, Home Insurance, and City Investing divest themselves of all Georgia Power and Southern securities. *Id.* at 36 (R. 596, J.A. 47). At the same time, however, he strongly recommended that the Commission re-evaluate its past decisions in light of his analysis of the legislative history and adopt a standard for section 305(b) applications requiring that the applicant demonstrate an overriding public benefit resulting from the interlock.

### C. *The Commission's Decision*

The Commission affirmed the ALJ's evidentiary findings but nonetheless denied Petitioner's application, adopting a stricter interpretation of section 305(b)'s standard than had heretofore prevailed, *i. e.*, one that required an affirmative showing of a public benefit from the interlock. November 6, 1979 Opinion and Order, *supra* note 1. The Commission stated that section 305(b) required the applicant to establish "justification for exemptions from the statute's general prohibition against interlocks" and concluded that this Petitioner "has failed to show any clear, overriding benefit as required by section 305(b)." The Commission offered no explanation for its departure from past precedent insisting that it·was only following similar holdings in two recent, related Commission decisions. *Id.* at 7 (R. 688, 696, J.A. 48, 56).[9]

Petitioner unsuccessfully applied for rehearing. May 7, 1980 Opinion and Order, *supra* note 1. A majority of the Commission stated in denying rehearing that "we have not radically changed, but have clarified, Commission policy on section 305(b)."

They denied Petitioner's assertion that the standard for obtaining authorization had in fact been changed without benefit of either rule-making proceeding or advance notice to Petitioner of what he must prove in the evidentiary hearing. *Id.* at 2 (R. 712, 714, J.A. 60, 62). The Commission also rejected the claim that its standard in this case was contrary to the Act, declaring that it

quite simply reflects the Congressional policy enunciated in section 305(b) . . . .
We feel that Congress meant to put the burden on the applicant to justify the interlock, and not on the Commission to find positive evidence that the applicant would be likely to abuse his position. Our approach permits the applicant to show as a basis for an exception a benefit likely to outweigh the potential harm that the statute was designed to cure . . . .
We have simply placed the burden of persuasion on the applicant.

*Id.* The Commission maintained that this interpretation of section 305(b) was consistent with its own past precedent, noting that it had "never retroactively authorized a chief executive officer and board chairman of a . . . utility to sit on an underwriter's board." *Id.* at 3 (R. 712, 715, J.A. 60, 63). However, one Commissioner dissented on the ground that the majority had in fact created a new standard and applied it to Petitioner without affording him due process in the form of notice and opportunity to make the requisite showing under the new test. *Id.* at Dissent (R. 712, 718–23, J.A. 60, 66–71) (Commissioner Sheldon, dissenting) (hereinafter "Dissenting Opinion").

The present appeal followed.

### II.  ANALYSIS

A. *The Commission's Statutory Authority to Require Proof of a "Clear, Overriding Benefit"*

Section 305(b) states that before authorization can be granted for an otherwise prohibited interlocking directorate, the Commission must affirmatively find that "neither public nor private interests will be adversely affected." 16 U.S.C. § 825d(b).

---

**9.**  Willis C. Fitkin, William C. MacInnes, ID–1709 and ID–1710 (June 25, 1979).

Section 305(b) does not, however, specify what the applicant must show in order to satisfy the no adverse effects requirement.[10] Hence, like the ALJ and the dissenting Commissioner we cannot agree with Petitioner that the statutory language itself restricts the Commission to requiring no more than that an applicant assert prospectively, or where applicable, rely on past history to show that he will not exploit the interlock by engaging in any conflict-of-interest dealings.[11] Nor can we agree with Petitioner that requiring the applicant to show a "clear, overriding benefit" from the interlock is contrary to the "clear and unambiguous language of section 305(b)."

■ We find the Commission's newly formulated view consistent not only with the statutory text of section 305(b) but with its legislative history. In his initial decision, the ALJ analyzed that history at length and we need not recapitulate it here. *See* Initial Decision of the ALJ, *supra* note 7, at 14–25 (R. 561, 574–85, J.A. 12, 25–36). It will suffice to note that during the passage of the Public Utilities Holding Company Act in 1935, Congress exhibited a relentless interest in, bordering on an obsession with, the evils of concentration of economic power in the hands of a few individuals.[12] It recognized that the conflicts of interest stemming from the presence of the same few persons on boards of companies with intersecting interests generated subtle and difficult-to-prove failures in the arm's length bargaining process.[13] Its overriding

10. Section 305(b) grants the Commission discretion to prescribe by regulation the "form and manner" of the required showing. These regulations are procedural only and do not speak to the substantive question of the applicant's burden of proof. *See* 18 C.F.R. § 45.

11. Under the burden of proof advanced by Petitioner

[a]ll the applicant need do is to assert, and this is precisely what [Petitioner] has done, that he has not in the past and will not in the future indulge in any conflict of interest or breach any fiduciary duty by virtue of his holding a[n] . . . interlocking directorate. Thus, the applicant's burden consists of nothing more than self-serving statements to sustain a finding that neither the public nor private interest will be adversely affected. . . [T]he Commission . . . must come forward with an affirmative showing that the applicant or the corporations involved have in fact engaged in past rascalities as would lead one to conclude that in all probability the leopard will not change its spots; and that these activities support a finding of an adverse impact. . . [This] becomes difficult if not impossible. . . .

Initial Decision of the ALJ, *supra* note 6, at 26–27 (R. 561, 586–87, J.A. 12, 37–38).

12. *E.g.,* 79 Cong.Rec. 10379 (1935) (remarks of Rep. Lea):

We have provisions here against interlocking directorates. This is a provision that to a degree will tend to break up the overwhelming organizations and the centralization of control that have been disclosed. There is a provision against dual directorships without approval of the Commission, or a banker acting as an officer or director, if he is a director or an officer of a bank that is engaged in underwriting or marketing public-utility securities.

With the approval of the Commission he may be permitted to retain his place upon the Board, but not otherwise. The same rule applies to an officer or director of an electrical equipment or supply company.

*Id.* at 10358, 13275–81 (remarks of Rep. Eicher); *id.* at 8383–8408 (remarks of Sen. Wheeler); *id.* at 8491, 8513–14, 8526 (remarks of Sen. Norris).

13. *E.g.,* 79 Cong.Rec. 8524 (1935) (remarks of Sen. Norris) ("one of the evils of the holding company system is that the directors sit on both sides of the table when contracts are being made."); *id.* (remarks of Sen. Norris) ("no man can perform his duty if there is any possible competition—and if there is no competition, then it is a combination—between these great corporations when he represents them both . . ."); *id.* at 8513–14; *id.* at 8402, 8407 (memorandum in Support of Constitutionality of Legislation read into record by Senator Wheeler) ("It does not follow that because a transaction separately considered is innocuous it may not be included in a prohibition the scope of which is regarded essential in the legislative judgment to accomplish a purpose within the admitted power of the Government. . . ."); *id.* at 8383–84 (findings of FTC read into record by Sen. Wheeler) ("in the last analysis the foregoing practices and the conditions which they have created must be judged not only by economic results but by ethical standards"); *id.* at 8389 (remarks of Sen. Wheeler) ("When is a holding company good, and when is it bad? Generally, it depends upon the whim of one man whether a company is good or whether it is bad. . . . Today, a holding company may have a good president who may be living up to the best

concern with eliminating the source of "evils result[ing] from an absence of arm's length bargaining" was expressed in the preamble to the Act which Congress explicitly referenced for guidance in interpreting all other provisions of the Act.[14] The legislative history makes clear too that Congress intended the Commission to have the broadest authority to achieve its objective of ameliorating the perceived evils of interlocking corporate relationships in the utilities field.[15] Petitioner has not cited to us any portions of the legislative history which compel the conclusion that requiring an applicant to demonstrate countervailing affirmative benefits is outside the broad authority conveyed by section 305(b). Therefore, we are satisfied that the Commission's adherence to a "clear, overriding benefit" test is not contrary to the statutory mandate of section 305(b).

We are further satisfied that on the present record there can be little doubt that the Commission's application of the benefit standard to Petitioner is reasonable and in keeping with the policies discussed in the preamble of the Act and the legislative history. The Act is prophylactic in nature; it allows the Commission to prevent, not merely remedy, abuses due to conflicts of interest. Thus, the Commission need not approve all applications for interlocks simply on the assurance, even if that assurance is backed by favorable history, that no such abuses will occur. In this case, Petitioner's numerous corporate positions create multiple interlocks, some prohibited—and some not prohibited—by the Act.[16] The Commission logically asserts that the public interest could be adversely affected by the prohibited interlocks because of

(1) lack of arm's length dealing and (2) market manipulation, which would occur if, for example, Home Insurance through its subsidiary Home Capital, should prop up an issue of Georgia Power stock, (3) breach by [Petitioner] of his fiduciary duty to the stockholders of Georgia Power, and (4) evasion of competition, competition being the consumers' patron saint. All of the above could result in higher costs for power service to Georgia Power's consumers. It is postulated that [Petitioner] could be tempted to benefit the

standards of business conduct—tomorrow, because of the control that is in the hands of a few people, the company may become an absolutely bad company.").

14. In 1935 Congress enacted the Public Utility Holding Company Act, 15 U.S.C. §§ 79 et seq. Title II of this Act contained what is now section 305(b) of the Federal Power Act. The preamble of the Public Utility Holding Company Act states that Congress found, on the basis of facts disclosed by reports of the FTC, and the reports of the House Committee on Interstate and Foreign Commerce, that the interests of investors in holding companies and their subsidiary companies, and the interests of consumers of electric energy are or may be adversely affected

when subsidiary public-utility companies . . . enter into transactions in which evils result from an absence of arms-length bargaining or from restraint of free and independent competition. . . .

15 U.S.C. § 79a(b)(2). The preamble further declared that:

all the provisions of this chapter shall be interpreted [with reference to such policy], to meet the problems and eliminate the evils as enumerated in this section, connected with public-utility holding companies . . . .

15 U.S.C. § 79a(c) (emphasis supplied).

15. E.g., 79 Cong.Rec. 8619, 10379 (1935). We must defer to the Commission's construction of the Act unless there are compelling indications that it is wrong. Ecee, Inc. v. FERC, 611 F.2d 554, 563 (5th Cir. 1980), quoting Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969); see also Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980); EPA v. State Water Resources Central Board, 426 U.S. 200, 227, 96 S.Ct. 2022, 2035, 48 L.Ed.2d 578 (1976).

16. See note 7 supra. For example, Petitioner sits on both sides of the bargaining table when Georgia Power purchases insurance from Home Insurance on delivery services from the railroad owned by Seaboard. Although this may present potential for conflicts of interest, it nonetheless falls outside the statutory jurisdiction of the Commission. As the ALJ correctly concluded, however, the Commission can review all of Petitioner's corporate activities and interlocks, including non-jurisdictional ones, when considering whether to approve an application for a specific interlock that does come within its jurisdiction. Initial Decision of the ALJ, supra at 13 (R. 561, 573, J.A. 12, 24).

other companies on whose boards he sits by purchasing services at higher than market costs from them for Georgia Power and then passing these extra costs along to the consumers. Or the market position of Georgia Power securities could be artificially developed by the investment patterns of the other companies of which [Petitioner] is a director, in conjunction with market manipulation by Home Insurance and Home Capital.

Initial Decision of the ALJ, *supra* note 7, at 12–13 (R. 561, 572–73, J.A. 12, 23–24). As the ALJ found

> The interlocks ... certainly concentrate great economic power in the hands of the few who are in a position to direct and control these enterprises, and where one man sits on the boards of several entities that regularly do business with each other, a potential for conflict of interest is ever present.

*Id.* We would, accordingly, not hesitate to affirm the Commission's denial of Petitioner's application on the basis of the new benefit standard as applied to the facts of this case, were it not for two procedural problems in the proceeding which we conclude require a limited remand.

### B. *The Commission's Departure From the Established Standard*

The Commission disingenuously asserts that "we have not radically changed, but have clarified Commission policy on Section 305(b)." May 7, 1980 Opinion and Order, *supra* note 1, at 826 (R. 712, 714, J.A. 60, 62). The ALJ's and the dissenting Commissioner's thorough and essentially unrefuted analyses of the last forty years of the Commission's precedent, however, compel us to conclude that "[n]owhere in the previous history of the Commission has there been a case in which it was decided, that section 305(b) *required* a 'clear overriding benefit' standard." Dissenting Opinion at 4 (R. 712, 721, J.A. 60, 69) (emphasis in original); Initial Decision of the ALJ, *supra* note 6, at 29–34 (R. 561, 589–94, J.A. 12, 40–45). In past decisions the Commission, rather than presuming interlocks to be harmful, has explicitly rejected mere speculation that an interlock will have adverse consequences— it "has tended to look for a specific adverse impact that has a strong likelihood of occurrence based on the past history of the individual and/or the company involved." Initial Decision of the ALJ, *supra* at 34 (R. 561, 594, J.A. 12, 45); *e. g., John Edward Aldred,* 2 FPC 247 (1940); *Mortimer N. Buckner,* 2 FPC 247 (1940); *Edward O. Boshell,* ID–1107 (1955); *John P. Wagner,* ID–1262 (1955).[17] Indeed, requiring proof of adverse effects was so entrenched that the ALJ himself felt compelled to follow that route in this case even though he thought it basically flawed from inception and strongly favored changing the standard to the "clear, overriding benefit" test. The only precedent the Commission cited in its own decision as a basis for the "clear, overriding benefit" standard was an opinion it rendered in two cases in 1979.[18] It is not at all clear that those cases were decided on the basis of the new standard, *see* Dissenting Opinion at 2–3 (R. 718, 719–20, J.A. 66, 67–68), and, in any event, they were decided well after Petitioner's 1977 evidentiary hearing before the ALJ. Certainly, as in this case, that opinion contained no announcement or explanation that the Commission was progressing to a new standard of proof in section 305(b) cases.

---

**17.** In John Edward Aldred, 2 FPC 247 (1940), the Commission first fully articulated its standards for evaluating section 305(b) applications. In this case and thereafter, the Commission based its denials of interlocks on specific examples of corporate abuse. *E.g., id.* (denying application to sit on board of investment banking firm while sitting on boards of three utilities where record revealed applicant had used position to aid failing investment bank to detriment of utility); Mortimer N. Buckner, 2 FPC 247 (1940) (a companion case to *Aldred*) (applicant allowed to hold several challenged positions but required to resign one directorship for failure to attend board meetings); John P. Wagner, ID–1262 (1955); Edward O. Boshell, ID–1107 (1955) (denying applications to sit on underwriting firm board while serving as directors of utility where record revealed underwriting firms' past "infamous" activities and that underwriting firm had dominated and controlled the utility company).

**18.** *See* note 9 *supra.*

■ The fact that the Commission has decided to change its substantive interpretation of section 305(b) by changing the nature of the. proof required of applicants for exemption is not, in and of itself, objectionable. As a general matter, an agency is free to alter its past rulings and practices even in an adjudicatory setting, *see, e. g., American Trucking Ass'n v. Atchison, Topeka & Santa Fe Ry.,* 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967). However, it is equally settled that an agency must provide a reasoned explanation for any failure to adhere to its own precedents. *E.g., Atchison, Topeka & Santa Fe Railway v. Wichita Board of Trade,* 412 U.S. 800, 806–17, 93 S.Ct. 2367, 2374–79, 37 L.Ed.2d 350 (1973) (*citing inter alia SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); *Secretary of Agriculture v. United States,* 347 U.S. 645, 653–54, 74 S.Ct. 826, 831–32, 98 L.Ed. 1015; *Columbia Gas Transmission Corp. v. FERC,* 628 F.2d 578, 585–86 (D.C.Cir.1979); *Public Service Comm'n v. FERC,* 584 F.2d 1084, 1087–88 (D.C.Cir.1978); *Boston Edison Co. v. FPC,* 557 F.2d 845, 848–49 (D.C.Cir.1977), *cert. denied,* 434 U.S. 956, 98 S.Ct. 482, 54 L.Ed.2d 314 (1977); *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C. Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). As Judge Leventhal stated in Greater Boston

> [A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion

it may cross the line from tolerably terse to intolerably mute.

444 F.2d at 852 (citations omitted).

In this case we do not believe the Commission has fulfilled its obligation to explain why it is changing course. Although we have the benefit of the ALJ's helpful discussion of the legislative history and past precedent, as well as his rationale for recommending the new standard, the sparse discussion of the new standard in the Commission's Opinions and Orders, *supra* note 1, allows us only to infer that the Commission embraces the ALJ's statutory analysis and reasoning. Something more precise than an inference—at least an explicit adoption of the ALJ's rationale—is requisite. *Secretary of Agriculture v. United States,* 347 U.S. 645, 654, 74 S.Ct. 826, 832, 98 L.Ed. 1015 (1954). Nor is the Commission's duty to explain itself discharged by its fleeting reference to the two 1979 cases in which the Commission purportedly applied the new standard since they do not contain announcement of a new standard and supporting rationale either.[19] *Cf. Atchison, Topeka & Santa Fe Railway v. Wichita Board of Trade,* 412 U.S. 800, 807, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973), and *NLRB v. Metropolitan Life Ins. Co.,* 380 U.S. 438, 443 n.6, 85 S.Ct. 1061, 1064, n.6, 13 L.Ed.2d 951 (1965) (An agency "may articulate the basis of its order by reference to other decisions").

■ Without any explicit recognition by the Commission that the standard has been changed, or any attempt to forthrightly distinguish or outrightly reject apparently inconsistent precedent,[20] we are left with no

19. *Id.* In *Fitkin* and *MacInnes* the Commission denied the applications on the basis of the *Aldred* case, *supra* note 17, which did not require a showing of "clear, overriding benefit." The only language in *Fitkin* and *MacInnes* resembling "clear, overriding benefit" is the last sentence: "Neither Applicant here has demonstrated the existence of any countervailing positive benefits which would warrant approval of their respective applications."

20. The Commission's treatment of its prior decisions in this case is almost cavalier. Aside from citing the two 1979 cases, the Commission's only consideration of prior precedent is the statement that "we have never retroactive-

ly authorized a chief executive officer and board chairman of a jurisdiction utility to sit on an underwriter's board." May 7 Opinion and Order, *supra* note 1, at 3 (R. 712, 715, J.A. 60, 63). But the Commission does not cite any case where it has *denied* an application by a chief executive officer and board chairman, and there have been other decisions granting applications at least in part, which the Commission does not mention or distinguish, where the applicant held comparable if not identical positions to those of Petitioner. *E.g.,* Mortimer N. Buckner, 2 FPC 247, 262–64, 266 (1940) (noting approval of other applications). *See also* Arleen W. Hughes, ID–1174 (1952).

guideposts for determining the consistency of administrative action in similar cases, or for accurately predicting future action by the Commission. The failure to admit or explain such a basic change in the interpretation of a statutory standard to be applied to conduct of the public undermines the integrity of the administrative process. *See Atchison, supra,* 412 U.S. at 807–08, 93 S.Ct. at 2374–75. Hence we remand to require the Commission to state its rationale for the new standard, and to explain its change of direction, so that we and future applicants may be assured as to the nature and grounds for the standard of proof under section 305(b).

## C. The Lack of Sufficient Notice to Petitioner of New Standard

The Administrative Procedure Act requires that a person involved in an agency adjudicatory hearing "shall be timely informed of . . . [the] law asserted." 5 U.S.C. § 554(b)(3). Courts have uniformly held that for an agency to meet this obligation where it seeks to change a controlling standard of law and apply it retroactively in an adjudicatory setting, the party before the agency must be given notice and an opportunity to introduce evidence bearing on the new standard. *E.g., American Louisiana Pipe Line Co. v. FPC,* 344 F.2d 525, 528–29 (D.C.Cir.1965), *citing Hill v. FPC,* 335 F.2d 355 (5th Cir. 1964); *United Gas Pipe Line v. FERC,* 597 F.2d 581, 586–88 (5th Cir. 1979) (demonstrating relation of this requirement to *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974)); *Giles Lowery Stockyards, Inc. v. Department of Agriculture,* 565 F.2d 321, 325 (5th Cir. 1977), *cert. denied,* 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1122 (1978); and *Port Terminal RR Ass'n v. United States,* 551 F.2d 1336, 1345 (5th Cir. 1977) (demonstrating relation of this requirement to *SEC v. Chenery,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)). *See also Public Service Comm'n v. FERC,* 584 F.2d 1084 (D.C.Cir. 1978); *Boston Edison Co. v. FPC,* 557 F.2d 845 (D.C.Cir.1977), *cert. denied,* 434 U.S. 956, 98 S.Ct. 482, 54 L.Ed.2d 314 (1977). Supreme Court cases suggest that such notice and opportunity to meet the new standard is a constitutional imperative of due process as well. *West Ohio Gas Co. v. Public Utilities Comm'n,* 294 U.S. 63, 70–71, 55 S.Ct. 316, 320, 79 L.Ed. 761 (1935); *Morgan v. United States,* 304 U.S. 1, 18–19, 58 S.Ct. 999, 82 L.Ed. 1129 (1938); *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 165–66, 71 S.Ct. 624, 645–46, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring); *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 611 n.10, 94 S.Ct. 1895, 1902 n.10, 40 L.Ed.2d 400 (cases collected) (1974). In those cases in which courts have not required the agency to allow the litigants to submit new evidence relevant to the newly announced standard, either actual notice of the operative standard existed at the time of the first hearing, or an additional opportunity to submit evidence was not deemed critical because the agency merely revised the legal significance of the same kind of facts. *E.g., United States Steel Corp. v. FPC,* 533 F.2d 1217, 1224 (D.C.Cir.1976); *City of Chicago, Illinois v. FPC,* 458 F.2d 731, 748 (D.C.Cir.1971), *cert. denied,* 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972); *Giles Lowery Stockyards, Inc. v. Department of Agriculture, supra; Continental Oil Co. v. FPC,* 378 F.2d 510, 519–20 (5th Cir. 1967), *cert. denied,* 391 U.S. 917, 88 S.Ct. 1801, 20 L.Ed.2d 655 (1968). But when, as here, the change is a qualitative one in the nature of the burden of proof so that additional facts of a different kind may now be relevant for the first time, litigants must have a meaningful opportunity to submit conforming proof. *E.g., Hill v. FPC, supra,* 335 F.2d at 363–65. In the words of the dissenting Commissioner

> Due process and fair play do not permit us to say to [Petitioner]: "Yes, you met all the requirements and standards about which we told you, but you did not meet the one about which we did not tell you. Therefore we deny your application."

Dissenting Opinion at 1 (R. 712, 718, J.A. 60, 66).

■ Though the evidence is somewhat equivocal, we conclude from the record before us that Petitioner was not sufficiently

apprised of the pending change in the burden of proof to have a meaningful opportunity to meet it. The Order to Show Cause, issued on February 18, 1977, stated only that:

> Applicant has failed to demonstrate that approval of the application filed herein *will not adversely affect public or private interests.* In the absence of a contrary showing, we are inclined to deny the application. . . .

(Emphasis supplied.) As already indicated, at the time of the notice, none of the Commission's previous decisions held that Petitioner was required to prove a "clear, overriding benefit." Rather, the pertinent decisions, *John Edward Aldred*, 2 FPC 247 (1940) and its progeny, held it "necessary to inquire into the corporate history and activities, corporate control and relationship of the corporations involved, as well as the history, qualifications, corporate connections and interrelations of the [applicants]," *id.* at 249, in order to determine *"[W]hether the conduct of such applicants . . . constitutes a violation of the principles of ethics or of good business which would make the continued holding by them of interlocking positions contrary to the public or private interest . . . ." Id.* at 261 (emphasis supplied). Petitioner submitted his proof under this standard and, in fact, the ALJ ruled in favor of Petitioner because he found that he had satisfactorily met the *prima facie* requirements set forth in the Order to Show Cause. Initial Decision of the ALJ, *supra* note 6, at 35 (R. 561, 595, J.A. 12, 46).

The Commission nevertheless argues that Petitioner had actual notice that an affirmative showing of an overriding public benefit would have to be made.[21] At the hearing, which lasted only a day, and in posthearing briefs it is true staff counsel for the Commission advocated, and Petitioner's counsel vigorously opposed, the new standard ultimately adopted in this case (*e. g.,* Tr. 11–12, 158–161). Accordingly, the Commission reasons that Petitioner had both notice and an opportunity to demonstrate any benefits which would result from the contested interlock, and his failure to do so cannot be attributed to the Commission's failure to advise him of his evidentiary burden. However, the ALJ stressed at the hearing that he was reserving his ruling on the staff counsel's argument for the benefit standard (Tr. 11–12, 78), and while it might well have been advisable in this situation for Petitioner to have offered evidence relevant to both standards, it was never explicitly suggested to him that he do so.[22] Further, since the ALJ subsequently ruled in Petitioner's favor there was no need for Petitioner to attempt to submit additional evidence after the hearing. Thus we cannot in good conscience construe his failure to submit any evidence at the hearing stage on the new standard as a waiver of his right to an opportunity to meet the new standard by which he was being judged after a different standard had applied for forty years. Under these circumstances Petitioner was entitled to, and did, build his

---

**21.** The Commission argues that Petitioner had notice of the new standard because the Order to Show Cause stated:

> This Commission's resolve with respect to public utility-underwriter interlocks has been consistent and steadfast. Thus, even where the Applicant has secured from an underwriter's board of directors a resolution declaring that such company will not underwrite or participate in the marketing of securities of any public utility so long as any interlock between the utility and the underwriter exists, we have denied such applications.

(R. 423, J.A. 3) We disagree. This statement in no way informs Petitioner that he must show a "clear, overriding benefit" from the interlock. It merely warns him that one company's simple promise not to deal in marketing the other company's stock will not necessarily assure approval.

**22.** There is a hint in the transcript that the ALJ would have preferred Petitioner to do so. (Tr. 12–13). He said, "Having stated what I view to be Respondent's and Staff's respective views of the law applicable to the case, I do not mean to rule out that each may have alternative backdown positions." (Tr. 13). However, in the total context of the case, we do not deem this veiled suggestion to be sufficient to apprise Petitioner of the need to offer evidence at the hearing relevant to staff counsel's proffered standard when the ALJ had not yet decided whether to apply it and in fact ultimately did not.

case in response to the Order to Show Cause. *See Public Service Commission v. FERC, supra,* 584 F.2d at 1037; *Boston Edison Co. v. FPC, supra,* 557 F.2d at 848 (notice of proposed rulemaking did not require applicants to submit evidence according to proposed but not yet adopted filing requirements).

We therefore conclude Petitioner lacked sufficient notice of the impending change in the standard of proof to warrant denial of an opportunity to supplement the record to meet the new standard. It ·is certainly within an agency's discretion to change rules and reinterpret statutory mandates in the course of adjudication as well as in rulemaking and, in appropriate circumstances, to apply such changes retroactively to the litigants in the proceeding. *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 290–95, 94 S.Ct. 1757, 1769–72, 40 L.Ed.2d 134 (1974); *SEC v. Chenery,* 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). But "[i]t [can] do that only in the form of an order, entered after *a due consideration of the particular facts in light of the relevant and proper standard." SEC v. Chenery,* 332 U.S. at 201, 67 S.Ct. at 1579 (emphasis supplied). An agency's latitude to amend its practices and standards in the context of a particular case imposes a correlative bur-

den on it to guarantee that the proceedings are fair to the litigants. *Hill v. FPC, supra,* 335 F.2d at 363. Its failure to carry this burden in this case necessitates an order of remand.

This result "will neither force unrealistic rigidity in the context of ... standards nor bring about administrative inefficiency." *Id.* at 363. The agency need not delay implementing the new standard across the board while it allows the individual party subject to the standard for the first time after the hearing record had been closed the chance to supplement the record. In the present case, since remand is necessary for the Commission to offer a clear statement of its rationale for the new standard, there is little if any extra burden or delay in allowing Petitioner to submit any additional relevant evidence, in form and manner prescribed by the Commission, he may have in order to meet the new standard.[23]

*Remanded.*

---

23. The stay of the order of the Commission under review herein entered by this court on June 5, 1980 is continued until further order of the court pending final resolution of the proceedings on remand.