DECISION
This consolidated appeal is before the Court from two separate decisions by the Director of the Department of Health[1] concerning applications from Johnston Ambulatory Surgical Associates Limited (JASA) for a Certificate of Need (CON) seeking approval to establish a Freestanding Ambulatory Surgery Center (FASC) in Johnston, Rhode Island. Jurisdiction is pursuant to R.I.G.L. 1956 § 42-35-1 et seq.
 Facts/Travel
In June 1994, JASA filed a Certificate of Need (1994 CON Application) to the Department of Health seeking approval to establish a FASC in Johnson, Rhode Island pursuant to R.I.G.L. 1956 § 23-15-1 et seq. JASA is a limited partnership comprised of (percentages in total partnership units):
 1) 60% General Partner Atwood Surgicare, Inc., a wholly owned subsidiary of Medical Care America, Inc., (MCA), itself wholly owned by Columbia/HCA Healthcare Corporation, and
 2) 40% Limited Partners Michael Rocchio, MD (10%), Robert Buonnano, MD (10%), Vincent Vacca MD (10%), and additional limited partners holding .5% units each.
On July 15, 1994, St. Joseph Hospital Services of Rhode Island, Inc. (St. Joseph's),[2] intervened and made a formal request for a public hearing pursuant to R.I.G.L. 1956 §23-15-6(c)(5) and section 12 of the Rules and Regulations. Fifteen separate public hearings were conducted by Mr. Joseph Almonte (Almonte), the Adjudicative Hearing Officer assigned to the case. At the conclusion of the hearings, the Project Review Committee II (Committee), consisting of ten members of the twenty-two member Health Services Council (Council), reviewed the record, compiled a Report (the 1994 Report) and recommended that the full council approve the application on the grounds that the FASC was both needed and affordable. On November 28, 1994, the council approved the committee report by a vote of 11-4, with five abstentions, and sent its recommendation to the Director of the Department of Health, Dr. Barbara DeBuono.
On December 3, 1994, Dr. DeBuono, in a twenty page decision, rejected the council's recommendation and denied the 1994 CON Application. Decision of the Director of Health, December 1994 (DeBuono Decision). In rejecting the recommendation, Dr. DeBuono specifically rebutted the counsel's findings and determined that the applicant had demonstrated neither the public need required for approval nor the affordability of the proposal. DeBuonoDecision, p. 20. JASA sought administrative review of the director's decision in accordance with the Administrative Procedures Act. As grounds for its appeal, JASA alleged that in view of the reliable, probative and substantial evidence on the record, the director had failed to give proper deference to the Council's recommendation.
In June 1995, while the administrative appeal was still pending, JASA filed a second Certificate of Need Application (1995 CON Application) to establish a FASC in Johnson, Rhode Island.[3] Again, St. Joseph's intervened and thirteen separate public hearings were conducted. By agreement of the parties, the evidence and testimony introduced during the 1994 CON Application proceedings were made part of the 1995 CON Application record. Meanwhile, on August 31, 1995, the Administrator of Adjudication upheld the director's denial of the 1994 CON Application. On September 29, 1995, JASA appealed that decision to this Court. The assigned case number for the appeal is C.A. No. 95-5301 (First Appeal).
On April 17, 1996, a Project Review Committee failed to approve the 1995 CON application by a vote of three to three, with one abstention. On June 4, 1996, the full council, by a vote of eleven to one, with five abstentions, voted to recommend approval of the 1995 CON Application and issued its Report (the 1995 Report). The 1995 Report stated that the 1994 decision was irrelevant to the 1995 CON Application, and that "[r]eview of the pending Certificate of Need Application demonstrates compliance with all statutory criteria, i.e., need and affordability." 1995Report, p. 13.[4] On June 14, 1996, the Director of the Department of Health, Dr. Patricia Nolan, accepted the recommendation of the full Council and approved the 1995 CON Application. The director did not address any of the issues raised by the previous director's decision and did not distinguish the second decision from the first decision. St. Joseph's sought administrative review of this decision. As grounds for its appeal, St. Joseph's contended that the second application should have been guided by the decision in the first application, and that the second director did not give due deference to the first director's decision. In response to this contention, the Department of Health stated that the 1994 record was substantially different from the 1995 record and that the two decisions are not inconsistent. It asserted that evidence deemed specifically important and relevant to Dr. DeBuono's decision was absent from the 1995 public hearings.[5] Notably absent from the memoranda submitted to this Court is any discussion of administrative finality, res judicata, collateral estoppel and inconsistent decisions.
On February 20, 1997, the Administrator of Adjudication upheld the director's approval of the 1995 CON Application. On March 19, 1996, St. Joseph's appealed the 1995 Decision to this Court. The assigned case number for the second appeal is C.A. No. 97-1356 (Second Appeal).
On April 16, 1997, St. Joseph's made a Motion to Consolidate the two appeals. As the basis for its Motion, St. Joseph's stated that as both cases involve common questions of law or fact, and that as the evidence in the first appeal was introduced by agreement in the second appeal, the cases should be consolidated pursuant to Super. R. Civ. P. 42. JASA objected to the Motion on the grounds that if resolution of the second appeal is in favor of JASA, the first appeal would be rendered moot and dismissed by JASA. Alternatively, JASA argued that if resolution of the second appeal is in favor of St. Joseph's, then JASA may or may not proceed to prosecute the first appeal. The Motion was granted on May 6, 1997.
Additional facts will be provided later as needed.
 Standard of Review
The review of a decision of the Commission by this Court is controlled by R.I.G.L. § 42-35-15(g), which provides for review of a contested agency decision:
 "(g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
This section precludes a reviewing court from substituting its judgment for that of the agency in regard to the credibility of witnesses or the weight of evidence concerning questions of fact. Costa v. Registry of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988); Carmody v. R.I. Conflict of Interest Commission,509 A.2d 453, 458 (R.I. 1986). Therefore, this Court's review is limited to determining whether substantial evidence exists to support the Commission's decision. Newport Shipyard v. RhodeIsland Commission for Human Rights, 484 A.2d 893 (R.I. 1984). "Substantial evidence" is that which a reasonable mind might accept to support a conclusion. Id. at 897. (Quoting Caswell v.George Sherman Sand Gravel Co., 120 R.I. 1981, 424 A.2d 646, 647 (1981)). This is true even in cases where the court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the agency. Berberian v. Dept.of Employment Security, 414 A.2d 480, 482 (R.I. 1980). This Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. Coastal Resources Management Council,434 A.2d 266, 272 (R.I. 1981). However, questions of law are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts.Carmody v. R.I. Conflicts of Interests Commission, 509 A.2d at 458. The Superior Court is required to uphold the agency's findings and conclusions if they are supported by competent evidence. Rhode Island Public Telecommunications Authority, etal. v. Rhode Island Labor Relations Board, et al., 650 A.2d 479, 485 (R.I. 1994).
1. Consolidation of the Appeals
In its Motion to Consolidate, St. Joseph's stated that as both cases involve common questions of law or fact, and that as the evidence in the first appeal was introduced by agreement in the second appeal, the cases should be consolidated pursuant to Super. R. Civ. P. 42. The JASA objected to the Motion on the grounds that if resolution of the second appeal is in favor of JASA, the first appeal would be rendered moot and dismissed by JASA. Alternatively, JASA argued that if resolution of the second appeal is in favor of St. Joseph's, then JASA may or may not proceed to prosecute the first appeal.
Rule 42 (a) of the Superior[6] and District Court Rules of Civil Procedure allows the consolidation of actions that involve "common question[s] of law and fact. Martins v. Lilly,505 A.2d 1156, 1159 (R.I. 1986). "[C]onsolidation is allowed to avoid unnecessary costs or delay and does not result in a merger of the cases." Id. The causes remain distinct throughout the trial. Id.
(citing Giguere v. Yellow Cab Co., 59 R.I. 248, 251, 195 A.2d 214, 216 (1937).
In the instant matter, both appeals involve common questions of law and fact. These commonalties include: both CON applications were submitted by JASA to seek approval to establish a FASC in Johnson, Rhode Island, pursuant to R.I.G.L. § 23-15-1et seq.; intervention by St. Joseph's; very little, if any, difference between the information supplied on both application forms; introduction of evidence and testimony from the 1994 CON application proceedings into the 1995 CON application proceedings; and, review of both appeals pursuant to the Administrative Procedures Act.
Although consolidation was proper in order to avoid unnecessary costs or delay, it must be remembered that the two appeals did not merge and that the causes of action remain distinct. This Court will address each appeal in the order that it was received and, in addition, will discuss such issues as administrative finality, administrative preclusion and inconsistency of decisions where appropriate.
2. The Certificate of Need
Basically, the core issue presented by both of these appeals is whether or not JASA should be granted a Certificate of Need by the Department of Health.
The purpose of the Health Care Certificate of Need Act of Rhode Island (the Act) is ". . . to provide for the development, establishment, and enforcement of standards for the authorization and allocation of new institutional health services . . . ." R.I.G.L. § 23-15-3. The Act and the Rules and Regulations promulgated by the Department of Health provide standards whereby a certificate of need may be granted. Pursuant to the Rules and Regulations "a certificate of need is required as a precondition to licensure of any new health care facility. . . ." R23-15-CON, Section 2.6.
 The Act provides that:
 "[n]o approval shall be made without an adequate demonstration of need thereof by the applicant at the time and place and under the circumstances proposed, nor shall the approval be made without a determination that a proposal for which need has been demonstrated is also affordable by the people of the state." R.I.G.L. § 23-15-4(a).
The Rules and Regulations track these requirements where, "[o]nly proposals for . . . new institutional health services as defined herein which are found by the state agency to be both needed and affordable shall be granted approval by the state agency." R23-15-CON, Section 2.3. In addition, "a determination of need shall not alone be sufficient to warrant a recommendation to the state agency that a proposal should be approved." R.I.G.L. §23-15-4(f)(1).
It is clear from a reading of the statute that demonstration of need and affordability involves a two-step process, whereby the applicant must make a showing of need first and then demonstrate that the proposal is affordable. It is equally clear that both elements are required before a certificate will be granted.
The Rules and Regulations provide definitions of "public need," "affordability" and "cost impact analysis." Public need is defined as:
 "a substantial or obvious community need for the specific . . . new institutional health service proposed and the scope thereof, in light of the attendant circumstances and in the context of the considerations outlined in sections 4.3(d) and 9.11 herein." R23-15-CON, Section 3.20.[7]
"Affordability means:
 ". . . the relative ability of the people of the state to pay for or incur the cost of a proposal, given:
 (a) consideration of the condition of the state's economy;
 (b) consideration of the statements of authorities and/or parties affected by such proposals;
 (c) economic, financial, and/or budgetary constraints of parties affected by such proposals;
 (e) other factors deemed relevant by the Health Services Council or the Director." R23-15-CON, Section 3.26.
"Cost impact analysis" is defined as:
 "a written analysis of the effect that proposal to offer or develop new institutional health services . . ., if approved, will have on health care costs and shall include, but not be limited to, consideration of the proposal's effects on increases in operating expenses, per diem rates, health care insurance premiums, and public health expenditures." R23-15-CON, Section 3.25.[8]
With respect to the allocation of burdens, the regulations state:
 "The burden is upon the applicant to prove the public need and affordability for the specific new institutional health service . . . proposed to be offered or developed, and the scope thereof, and to demonstrate compliance with all matters required by law and the regulations herein, through the information provided in the application." R23-15-CON, Section 9.7
A. The 1994 CON Application
As the basis for appealing the denial of the 1994 CON Application, JASA asserts that by failing to give due deference to the findings of the full Council, Dr. DeBuono committed an error of law in violation of the two-tier review process for reviewing certificate of need applications. In addition, JASA asserts that reversal of the decision is warranted because it is (i) clearly erroneous in light of the reliable, probative and substantive evidence in the record, and (ii) arbitrary, capricious and characterized by an abuse of discretion.
(i) The Deference Standard
JASA argues that the two tiered agency review process applies to all CON Application proceedings. As a result of this process, JASA argues, the director is required to give great deference to the findings of the Council unless those findings are clearly wrong. See Environmental Scientific Corp., v. Durfee,621 A.2d 200 (R.I. 1993).
In Rhode Island, it is well settled that in order to effectuate the Legislature's intent, our Supreme Court examines a statute in its entirety and gives the words their plain and ordinary meaning. In re Falstaff Brewing Corp., 637 A.2d 1047, 1049 (R.I. 1994). When a statute has a plain, clear and unambiguous meaning the Legislature's intent is gleaned from the plain and literal language contained therein. Parkway Associatesv. Godfrey, 688 A.2d 1289, 1294 (R.I. 1997). If a mechanical application of a statutory definition produces an absurd result or defeats the Legislature's intent our Supreme Court will look beyond mere semantics and give effect to the purpose of the act.In re Falstaff Brewing Corp., 637 A.2d at 1050. The primary task in construing a statute is to attribute to the enactment the meaning most consistent with its policies and with the obvious purposes of the Legislature. Id. "Every word, sentence or provision in a statute is presumed to have some useful purpose and is intended to have some force and effect." Gross v. State ofRhode Island. Division of Taxation, 659 A.2d 670, 671 (R.I. 1995).
The Health Services Council is defined as "the advisory body to the Rhode Island Department of Health . . . appointed and empowered as hereinafter provided to serve as the advisory body to the state agency in its review functions under this chapter" R.I.G.L. § 23-15-2(7). See Also R.I.G.L. § 23-15-7 ("The health services council . . . shall function as the advisory body to the state agency in discharging the purpose of this chapter"). This language clearly states that the function of the Council is to act as an advisory body to the Department of Health.
The term "advisory" is defined as "counseling, suggesting, or advising, but not imperative or conclusive.' BLACK'S LAW DICTIONARY 54 (6th ed. 1990)." "Advise" imports that it is discretionary or optional with the person addressed whether he will act on such advice or not." Id. An "advisory committee" may make recommendations but the receiver of those recommendations is free to ignore that advice." Alaska Public Easement Fund v.Andrus, 435 F. Supp. 664, 673 (??? 1977). With respect to CON applications, the Council must review the applications, make findings and submit a recommendation to the director.[9] A recommendation is not an act of final decisive power — it merely suggests the desirability of a course of action to be followed by another. Beckwith v. Rhode Island School of Design, 404 A.2d 480, 485 (R.I. 1979). This definition suggests that the director is free to reject the Council's recommendations at will; however, the Regulations limit this discretion.
Once the Council submits its recommendation, "[t]he state agency shall render a written decision . . . on all applications . . . based on the findings and recommendations of the Council unless the state agency shall afford written justification for variance therefrom." Reg. 13.7. "If the state agency renders a decision contrary to the findings and recommendations of the Council, it must afford written justification for its variance therefrom." Reg. 13.8. Although the language of the Regulations clearly permits the director to reject a recommendation of the Council, it is equally clear that the director must provide a written explanation for any such rejection. The language of the CON statute is similar to the language of R.I.G.L 1956 § 42-17.7-6 (1) which our Supreme Court examined in Environmental Scientific Corp.[10]
In that case, the Court recognized the hearing officer as "an indispensable element of the administrative procedure."Environmental Scientific Corp, 621 A.2d at 207. "Sitting as if at the mouth of the funnel, a hearing officer hears testimonial and documentary evidence from all affected parties: the applicant, the department, and interested members of the public. Just as the funnel narrows, the hearing officer analyzes the evidence, opinions, and concerns of which he or she has been made aware and issues a decision." Id. The Court then stated that "[b]ecause the director sits at the narrowest point of the funnel, he or she is not privileged personally to hear or witness the broad spectrum of information that entered the widest end of the funnel. Therefore, the further away that an administrative official is when he or she evaluates the adjudicative process, the more deference should be owed to the factfinder." Id. at 208. In reaching this conclusion, the Court found significant that, unlike the director, the hearing officer had the opportunity to hear live testimony. Id. at 207. The Court further noted that "[w]hen firsthand observations are not in issue, the appellate division may review the findings of the trial judge de novo." Id.
In the instant matter, St. Joseph's, as an affected party, intervened in the 1994 CON application and requested public hearings.[11] Fifteen public hearings were conducted by an adjudicative officer in accordance with the Regulations.[12]
The adjudicative officer, who was present at all of the hearings, did not have any input into the actual decision. The record indicates that various Council members attended various public hearings, but that the only time that the Council assembled as a full body to discuss the application was on November 28, 1994, the date that it voted on the matter.[13]
In order to make its credibility determinations, the Council had to rely, in large part, upon written transcripts of the hearings. This fact distinguishes the instant matter from that ofEnvironmental Scientific Corp. Although the Court stated that "the director should give great deference to the hearing officer's findings and conclusions unless clearly wrong" (Environmental Scientific Corp., v. Durfee, 621 at 209-210), such a standard stemmed from the fact that the hearing officer had the opportunity to weigh live testimony and was, therefore, in a better position to make credibility determinations. Indeed, even in that case, the Court recognized that "the decision maker may reject the hearing officer's recommendations on questions involving the credibility of contradictory witnesses," and stated that "(t)he agency director need not accept the hearing officer's findings if there is other, competent evidence in the record to support the agency's conclusion." Id. at 207.
In this case, however, the full Council did not weigh live testimony; rather, it merely reviewed the record in order to make its determinations. Subsequently, the Director reviewed the same record and made her own determinations.
(ii) The Competent Evidence Standard
The next issue to be addressed is whether there is competent evidence in the record to support the agency's decision.
As noted above, in order to obtain a certificate of need, JASA has the burden of proof to demonstrate the public need and affordability of the proposed FASC. "The purpose of underlying both state and federal [certificate of need] statutes is to contain the costs of medical care by restricting the construction of unneeded health facilities. West Bloomfield Hospital v.Certificate of Need Board, 550 N.W.2d 223, 226, footnote 9 (Mich. 1996) (citing Greenbriar Convalescent Center v. HealthDepartment, 310 N.W.2d 812 (Mich. 1981).
In the recommendation adopted by the Council and submitted to the director, the Committee determined that JASA had "adequately made a demonstration of public need at the time and place and under the circumstances proposed." 1994 Report, p. 8. In reaching this conclusion, the committee acknowledged that JASA had conducted a phone survey of ten existing providers which reported "waiting times of no wait to 1 week at Wayland Square and Blackstone Valley to 3-4 weeks at Women and Infants Hospital."1994 Report, p. 4. The Committee stressed the efficiencies, cost effectiveness and fast turnaround times[14] of two existing FASCs, Blackstone Valley Surgicare (Blackstone) and Wayland Surgical Center (Wayland),[15] with the inefficiencies and slow turnaround time of area hospitals with mixed inpatient and outpatient settings (such as that provided by St. Joseph's). See1994 Report. p. 4-7. To support these comparisons, the Committee relied upon the testimony of several of JASA's limited physician investors. After accepting the observations of these investors, the Committee stated that these "inefficiencies impact the patients and delay bringing their surgical procedures to an expeditious conclusion." Id. p. 6-7.
In contrast, the director stressed the underutilization of existing ambulatory surgery facilities. DeBuono Decision, p. 7-11. After reviewing the record, she noted that: the Miriam Hospital was running at about 50-55 percent capacity (Id. p. 8); excluding capacity for vacant space, Roger Williams Hospital was operating at approximately 63 percent of operating capacity (Id.
p. 9); utilization at Blackstone had declined over the years and was unlikely to reach its 1994 projections (Id. p. 9, 11); and, Wayland had vacant time on its booking schedules in addition to being behind in its already reduced projections for 1994. Id. p. 9, 12. The director stated that there was "persuasive evidence in the record showing that Rhode Island outperforms the nation as to the percentage total surgeries performed on an outpatient surgery basis." Id. p. 11, 12.
After weighing conflicting testimony concerning turnover time, the director found persuasive the evidence introduced by St. Joseph's that its turnover time was not unreasonable or excessive in duration. The director then concluded that "turnover time has not been shown to be a material issue in this case weighing on the side of demonstrated need." Id. p. 12. To support this conclusion, the director noted that given the increasing role of managed care, "[t]here are times because of insurance coverages that patients are going to be required to utilize certain health care facilities and there has been testimony that, in those instances, quicker turnover time, or more efficient operations won't make a bit of difference." Id.
Both the Committee and the director refer to the "Zimmerman Report" in their decisions to support their findings on need.[16] Mr. Zimmerman compiled a report concerning the utilization of surgical facilities which included inpatient operations, major outpatient procedures and minor outpatient procedures. Exhibit 30, p. 2. The analysis is based on facility use at 80 percent of maximum capacity and allows the same amount of time for completion of a minor procedure as for the completion of a major outpatient procedure, this produced a liberal estimate for the need for facilities. Id. Table 1 of the Report shows the estimated need for total operating rooms for the years 1994-1997 and projects that Rhode Island will need 140 operating rooms by 1997.[17] Table 2, "Operating Rooms in Rhode Island, 1994," shows that the number of available operating rooms is 164, whereas, the number of staffed rooms is 143. Table 3 projects the total need for operating rooms in the years 1994-1997.[18]
In its recommendation, the Committee determined that Mr. Zimmerman's testimony and Report supported the need for additional outpatient surgery rooms. 1994 Report, p. 7. The Committee conceded that table 3 of the Zimmerman Report shows a surplus of operating rooms for the years 1994-1997. Id. However, it also noted that Mr. Zimmerman admitted that Table 3 "does not indicate the projected need for or supply of dedicated outpatient operating rooms." Id. The Committee then concluded that the information in Table 3 is irrelevant to a finding of the need for dedicated outpatient rooms in light of the documented inefficiencies of the mixed operating room setting as evidenced by the settings provided by the FASCs and St. Joseph's. Id.
The director disagreed with this conclusion. In her decision, the director noted that Mr. Zimmerman testified that the rate of growth of outpatient procedures had slowed; that the total need for operating rooms in Rhode Island will increase from 136 in 1994 to 140 in 1997; and, that although the data concerning the existing operating rooms was not separately categorized, the number of staffed rooms in 1994 [143 operating rooms] was sufficient to meet projected demand for 140 through 1997. DeBuonoReport, p. 14-15.
The director then concluded that "the existing and projected unused capacity for outpatient surgery so significantly outweighs the benefits of the assumed lesser reimbursement per procedure by the applicant that the public interest is best served by denial of this proposal." Id. p. 16. The director found that JASA had failed to demonstrate public need as required by the statute and regulations and because of that issue alone the proposal must be denied. Id.
On the issue of affordability, the Committee wrote extensively on the relative differences in the reimbursement rates given to JASA and to St. Joseph's. 1994 Report, p. 10-15. It concluded that "reimbursement at the proposed facility will be at a lower rate than reimbursement for the identical procedures at St. Joseph's." (Id. p. 10) and that lower reimbursements "saves money in the system." Id. p. 12.
The Committee also concluded that St. Joseph's projected loss of approximately 2% in net revenues would not adversely impact the hospital. Id. p. 15-18. In fact, it concluded that St. Joseph's ambulatory service "would likely become more competitive with its rates as it learns to co-exist with JASA." Id. p. 17. The Committee noted that the St. Joseph's center for health and human services, which is partially funded from ambulatory surgery profits, "was planned to operate at a loss when it was first created," and that "JASA should not be penalized because of imprudent decisions by St. Joseph's." Id.
The director acknowledged that there was conflicting testimony concerning the relative cost-effectiveness of ambulatory surgery. However, she stated that "when considering affordability, the focus is whether the proposal is affordable to the people of the state." DeBuono Report, p. 18. The director then concluded that, based on the evidence in the record, the proposal "would impact St. Joseph in a negative manner with potential to limit access to a significant portion of the underserved population." Id. In addition, the director noted that duplicative services and excess operating rooms would increase the cost per procedure to patients on a statewide basis because of the operating expenses associated with running a surgery center. Id. p. 18-19. Consequently, the director concluded that JASA "failed to meet its burden of proof on the issue of affordability independent of its failure to meet its burden of proof on the issue of public need." Id. p. 19.
"[A]n administrative officer deciding a case upon recommendations by a hearing officer need not actually hear witnesses testify or hear oral argument, but the decision maker must consider and appraise the evidence before rendering a decision . . . ." Environmental Scientific Corp., v. Durfee,621 A.2d 200, 207 (R.I. 1993). "[T]he [director's] rationale [for rejecting the hearing officer's findings] should be supported by competent legal evidence. Id. at 208.
In the instant matter, the director, like the Council, did not hear witnesses or hear oral argument, but she did consider and appraise the evidence. The director's rationale for rejecting the Council's findings was supported by competent legal evidence in the record. Unlike the Council, which stressed the slow turnaround times, inefficiencies and higher reimbursement rates of mixed outpatient ambulatory settings, the director placed emphasis on the already existing excess capacity in the state in order to conclude that JASA failed to demonstrate a public need for the proposed FASC. With respect to affordability, the director found that the proposed FASC would duplicate existing services, thereby increasing the overall cost of health services to the people of the state. In addition, the director concluded that the potential loss of revenue to St. Joseph's would adversely impact the services which St. Joseph's provides to underserved populations of the state.
After a review of the entire record for the 1994 CON Application, the Court finds that the decision of the director to reject the Council's recommendation is supported by reliable, probative and substantial evidence in the record. Substantial rights of the appellants have not been prejudiced. Accordingly, the First Appeal, C.A. No. 95-5301, is denied and dismissed.
B. The 1995 CON Application
As previously stated, while the appeal from the denial of the 1994 CON Application was pending, JASA submitted a second CON Application in 1995. The new director, Dr. Nolan, accepted the Council's Report and Recommendation for this new application and granted the Certificate of Need. St. Joseph's immediately appealed the decision.[19] Subsequently, St. Joseph's Motion to Consolidate the Appeals was granted.
As grounds for its appeal, St. Joseph's contended that the second application should have been guided by the decision in the first application, and that the second director did not give due deference to the first director's decision. In response to this contention, the Department of Health stated that the 1994 record was substantially different from the 1995 record and that the two decisions are not inconsistent. It asserted that evidence deemed specifically important and relevant to Dr. DeBuono's decision was absent from the 1995 public hearings.
Our Supreme Court has stated that "[t]he underlying philosophy of the administrative process for settling disputes is to give finality to findings of fact made by administrative agencies, when such findings are supported by competent evidence and are procedurally proper." Lemoine v. Department of MentalHealth, Retardation and Hospitals, 113 R.I. 285, 291,320 A.2d 611, 614 (1974). Although the Regulations do not specifically prohibit the filing of a subsequent CON Application, the language in R.I.G.L. § 23-15-4 (b) suggests that there must be a material change in circumstances before such a subsequent application may be granted. Section 23-15-4 (b) states:
 "[n]o approval shall be made without an adequate demonstration of need thereof by the applicant at the time and place and under the circumstances proposed, nor shall the approval be made without a determination that a proposal for which need has been demonstrated is also affordable by the people of the state." R.I.G.L. § 23-15-4(b) (emphasis added).
This language suggests that if, at the time and place and under the circumstances proposed, an Application is denied then, unless those circumstances change at a later time and place, a second Application must also be denied. This conclusion is supported by the Doctrine of Administrative Finality.
(i) The Doctrine of Administrative Finality.
In the context of zoning decisions, "[w]here a zoning board hears an application for relief and denies it, the doctrine of administrative finality bars a subsequent application for the same relief absent a showing of a change in material circumstances in the time intervening between the two applications. Audette v. Coletti, 539 A.2d 520, 521-522 (R.I. 1988). "[A]n important goal in the administration of justice is repose." Id. at 522. "[T]he authority of a board to reverse a prior determination is a qualified one and is not to be exercised unless there has been a material change in the circumstances or conditions intervening between the two decisions." Burke v.Zoning Board of Review, 103 R.I. 404, 408, 238 A.2d 50, 53 (1968). "The rule is grounded in the necessity to deter the exertion of improper influences and lend finality to the board's determination . . . and to prevent interested parties from being unduly harassed and injured through being called upon to contest repeated and frequently occurring agitations pertaining to the same subject matter." Marion Road Association. Inc., v. WestportPlanning and Zoning Commission, 1994 W.L. 592221 (Con. Super.) (internal citations omitted). Thus, "[a] reversal of a prior denial of relief should ordinarily predicated upon a factual situation differing materially from that existing at the time of the earlier decision and the occurrence of a substantial change in conditions is generally a condition precedent to the exercise of jurisdiction. Marks v. Zoning Board of Review of City ofProvidence, 98 R.I. 405, 406-407, 203 A.2d 761, 763 ((1964).
In the instant matter, a careful review of the 1994 and 1995 applications reveals that there is very little difference between their respective contents. The differences that do exist do not reflect any substantial or material change in circumstances. The only real "difference" between the two applications of record contained in question 61. There, JASA asserts that Blackstone is performing more complex cases which result in less procedures per day and that Wayland is on schedule for its projected procedures.[20] In question 37 of the 1995 CON Application, JASA added one sentence to the end of a paragraph.[21] The answer to question 52 deleted the section concerning the telephone survey which was taken for the 1994 CON Application. Both question 52 and question 65 declare that evidence of public need and affordability can be found in the Council's 1994 Report and Recommendation, the same Report which was subsequently submitted to, and rejected by, the director.[22] Not only is this not evidence of a material change in circumstances, it represents a complete disregard by JASA of the previous director's decision. In addition, these references appear to be an attempt by JASA to reinstate the Council's findings through the application procedure rather than through the appeals process.
The lack of any apparent substantial change in circumstances between the 1994 and 1995 CON Applications seriously raises the issue as to whether or not the Department of Health ever possessed had jurisdiction to entertain the second application. Assuming that the Department of Health did in fact have jurisdiction to accept the 1995 Application, the issue of administrative preclusion must be addressed and whether JASA presented evidence which amounted to a substantial and material change in circumstances to overcome this issue.
(ii) Administrative Preclusion
"When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose." Astoria Federal Savings and Loan Association v.Solimino, 501 U.S. 104, 107, 111 S.Ct. 2166, 2169, 115 L.Ed.2d 96 (1991).
 "Such repose is justified on the sound and obvious principle of judicial policy that a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise." Id. "To hold otherwise would as a general rule, impose unjustifiably upon those who have already shouldered their burdens and drain the resources of an adjudicatory system with disputes resisting resolution." Id. The principle holds true when a court has resolved an issue, and should do so equally when the issue has been decided by an administrative agency, be it state or federal." Id. "Although administrative estoppel is favored as a matter of general policy, its suitability may vary according to the specific context of the rights at stake, the power of the agency, and the relative adequacy of agency procedures." Astoria Federal Savings and Loan Association v. Solimino, 501 U.S. at 107, 111 S.Ct. at 2170, 115 L.Ed.2d 96 (1991)."
In Rhode Island, our Supreme Court has stated that "[g]enerally the doctrine of res judicata makes prior judgments conclusive in regard to any issues that were or could have been raised before the first tribunal." Department of Corrections v.Tucker, 657 A.2d 546, 549 (R.I. 1995). "The same rule should apply to the decision of a quasi-administrative tribunal as to the judgment of a court. Id. The restatement suggests that such an adjudicative determination will be conclusive as long as the administrative tribunal grants to the parties substantially the same rights that they would have if the matter were presented to a court. Id. "The decision of the hearing officer is not the final agency decision, it is the final decision of the director that constitutes the final agency action." Birchwood Realty Inc.,v. Grant, 627 A.2d 827, 834 (R.I. 1993).
In the instant matter, the hearings took place before an Adjudicative Hearing Officer who accorded the parties an adequate opportunity to litigate the issues. The Department of Health made final decisions on both applications, although the first appeal was not finally adjudicated by this Court prior to the initiation of the second appeal. A final decision has now been rendered on the first appeal in this matter wherein two administrative appeals on two separate applications have been consolidated. Because the Department of Health made final decisions on both applications, there remains the issue of whether or not these decisions are administratively consistent.
(iii) Inconsistent Decisions
"As a general matter, an agency is free to alter its past rulings and practices even in an adjudicatory setting . . . However, it is equally settled that an agency must provide a reasoned explanation for any failure to adhere to its own precedents." Hatch v. Federal Energy Regulatory Commission,654 F.2d 825, 834 (D.D.C. 1981) (citations omitted). "An agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from tolerably terse to intolerably mute." Id. (citing GreaterBoston Television Corp., v. Federal Communications Commission,444 F.2d 841, 852 (D.C. Cir. 1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)).
A Commission has a "well established right to modify or even overrule an established precedent or approach, for an administrative agency concerned with furtherance of the public| interest is not bound to rigid adherence to its prior rulings. Lodged deep within the bureaucratic heart of administrative procedure, however, is the equally essential proposition that, when an agency decides to reverse its course, it must provide an opinion or analysis indicating that the standard is being changed and not ignored, and assuring that it is faithful and not indifferent to the rule of law. Columbia Broadcasting System,Inc., v. Federal Communications Commission, 454 F.2d 1018 (D.D.C. 1971) A Commission "must explain its reasons and do more than enumerate factual differences, if any, between . . . [similar] cases; it must explain the relevance of those differences. . . ."Id. (finding that the Commission's utter failure to come to grips with the problem of two conflicting decisions, and its failure to justify their coexistence, constituted an inexcusable departure from the essential requirement of reasoned decision making).
"The rule of law is intended to eliminate the appearances as well as the reality of arbitrariness, and if the public's faith in its administrative agencies be maintained, it is imperative that these agencies act in a wholly rational, logical fashion, completely free from even the appearance of bias, prejudice and improper influence." Columbia Broadcasting System. Inc., v.Federal Communications Commission, 454 F.2d 1018 (D.D.C. 1971) (overturning the Commission's decision as arbitrary where the Commission ignored its own obvious precedent). "The failure to admit or explain . . . a basic change in the interpretation of a statutory standard to be applied to conduct of the public undermines the integrity of the administrative process." Hatch v.Federal Energy Regulatory Commission, 654 F.2d at 834 (remanding the case for an explanation of the Commission's rationale). Seealso Community Care Centers, Inc., v. Indiana Department ofPublic Welfare, 523 N.E.2d 448, 451 (Ind. App. 2 Dist. 1988) (setting aside a departmental decision which was inconsistent with several previous departmental decisions stating that "[t]he fact that different conclusions were reached based on the same underlying facts points to an arbitrary result); and, DentalSociety of the State of New York v. New York State TaxCommission, 538 N.Y.S.2d 375, 377 (A.D. 3 Dept. 1989) ("The general rule is that an agency cannot render inconsistent decisions without explaining its reasons").
In the instant matter, the Department of Health rendered two inconsistent decisions on what appear to be essentially the same facts. The 1995 decision stated that the 1994 decision was irrelevant to the 1995 CON Application, and that "[r]eview of the pending Certificate of Need Application demonstrates compliance with all statutory criteria, i.e., need and affordability." In adopting the 1995 Report, the director did not address any of the issues raised by the previous director's decision and did not distinguish the second decision from that of the first. In fact, the first time the Department of Health attempted to distinguish the two decisions was in its memoranda to the Administrative Adjudicator and to this Court. At that point, the Department asserted that there are substantial differences between the 1994 record and the 1995 record and that the two decisions are not inconsistent.
These substantial differences, the Department asserts, include: (a) evidence that 1995 utilization at Blackstone and Wayland was materially different from that of 1994; (b) lack of evidence presented against the proposal during the 1995 hearings on the issue of underutilization of existing facilities — an issue which was deemed specifically important and relevant to the 1994 finding of no adequate demonstration of public need at the time and place and under the circumstances proposed; and, (c) the 1995 Zimmerman Report.
Like the 1994 Report, the 1995 Report stressed that FASCs such as Wayland and Blackstone are more efficient, cost effective and have faster turnaround times as compared to the mixed inpatient and outpatient settings. See 1995 Report, p. 4-14. Unlike the 1994 Report, however, the 1995 decision was adopted by the director as her final decision. In her decision, the director relied upon testimony given by limited physician investors who reiterated the testimony that they gave in the previous hearings concerning turnaround times and the "inherent inefficiencies of the hospital based outpatient facility." Id. p. 11-13.
In addition, the director noted that Wayland had performed more procedures than budgeted for the period January, 1995, to November, 1995. The director stated that "although the number of procedures at [Blackstone] decreased slightly, the mix of procedures has changed to the more complicated procedure taking longer hours." 1994 Report, p. 10. In response to the suggestion by St. Joseph's that its lack of 100% capacity evidences a lack of need, the director stated that this "is unfair and misleading as all parties concur that most doctors prefer to perform outpatient surgery in the morning hours with its documented benefits for the patients." Id. The director also stated: "[w]hether St. Joseph's [ambulatory surgery] is at capacity or not is irrelevant to a finding of need since the evidence shows that St. Joseph's and other hospitals in this state cannot provide outpatient surgical services in the efficient manner and on the cost efficient basis of [Blackstone/Wayland], and the proposed facility."
The 1995 findings of the director, namely the longer turnaround times, greater inefficiencies and higher reimbursement rates of mixed patient outpatient ambulatory settings, mirror the findings which were submitted to, and rejected by, the director in the 1994 CON Application process. To find that St. Joseph's excess capacity is "irrelevant to a finding of need" is in direct contradiction with the previous decision, which stressed that existing capacity is a very important consideration in determining need. Moreover, the fact that most doctors may "prefer to perform outpatient surgery in the morning hours" is completely irrelevant to whether or not existing facilities are underutilized. As to the issue of turnaround time, the previous director found that it had "not been shown to be a material issue in this case on the side of demonstrated need." The 1995 decision made no attempt to show how this issue has since become material. Consequently, although findings on turnaround time may not be inconsistent with the previous decision, they remain, nevertheless, an immaterial issue with respect to need.
In the 1995 decision, the director rebutted various claims asserted by St. Joseph's in opposition to the CON Application.Id. p. 13-14. After demonstrating that St. Joseph's could not fulfill its claim that the cost per procedure, expenses per procedure, and the revenue per procedure could not be done more economically at St. Joseph's Hospital than at the proposed FASC, the director concluded that
 "[t]he house of cards built by St. Joseph's in opposition to the 1994 and 1995 applications has fallen. A review of the competent evidence in the record shows that there is a need for the quality, cost-effective services to be provided to the people of the State of Rhode Island if the Application is to be approved." 1995 Report, p. 8.
In response to St. Joseph's submission into evidence of the previous decisions issued with respect to the 1994 CON Application, the director responded by stating that they "are irrelevant to the matter currently before the Department, namely JASA's Certificate of Need Application filed in the 1995 summer cycle. St. Joseph's reliance upon such irrelevant matters underscores the weakness of its opposition." Id. p. 13.
St. Joseph's does not have any burden to show the strength of its opposition. The burden to prove the public need and affordability of the proposal falls squarely upon JASA. See
R.I.G.L § 23-15-4 (b) and R23-15-CON, Section 9.7. By placing a burden upon St. Joseph's, the director is implicitly suggesting that where there is no opposition to a CON Application, it will be granted automatically. Such an interpretation would defeat the entire purpose of the statutory scheme and produce an absurd result.
The 1994 decision found that evidence of the underutilization of existing facilities was a critical factor in determining that JASA had not adequately demonstrated need. The Department of Health now appears to be suggesting that an absence of this particular type of evidence presented against JASA in the 1995 hearings constitutes a substantial change in circumstances. This argument has no merit. The 1994 evidence of underutilization had become part of the 1995 record agreed upon by the parties. The fact that the same evidence was not re-introduced at the 1995 hearings does not establish a substantial change in circumstance; any conclusion to the contrary would unfairly shift the burden of proof to the objector and away from the applicant. As this evidence was already part of the record, JASA had the burden of proving that the underutilization rates at existing facilities had changed materially and constituted a demonstration of public need. JASA failed to meet this burden.
The director pointed out in her decision that Blackstone performed fewer procedures in 1995 because it had increased the complexity of its operations. What she did not mention was that Blackstone was about four percent under budget. HearingTranscript, September 18, 1995, p. 39-40. The director also mentioned that Wayland was ahead of its budgeted procedures for 1995. The director neglected to mention that although Wayland had three days of blocked time with little or no availability, that Friday was really slow, and that other than that, Wayland was pretty much at capacity. Id. p. 39. Indeed, the Memorandum submitted to this Court by the Department of Health, points out that, based upon the Zimmerman method, Wayland was operating at only approximately 51 percent utilization. Reply Memorandum ofRhode Island Department of Health, p. 9.
The 1995 Zimmerman Report
In 1995 Mr. Zimmerman updated his report concerning the Need for Ambulatory Surgical Facilities in Rhode Island (Exhibit95-60) and testified at the 1995 hearings. Again, the analysis was based on facility use at 80 percent of maximum capacity and allowed the same amount of time for completion of a minor procedure as for the completion of a major outpatient procedure. This produced a liberal estimate for the need for facilities.Exhibit 95-60, p. 3. Table 1 of the Report shows the estimated need for total operating rooms for the years 1996-1999 and projects that Rhode Island will need 145 operating rooms by 1999.[23] Table 2 shows that the number of available operating rooms remains at 164, whereas, the number of staffed rooms has decreased to 141. Id. p. 6. Table 3 projects the total need for operating rooms in the years 1995-1999. Id. p. 7.[24] The Report also noted that St. Joseph's took six operating rooms at its Providence unit out of service and that Westerly Hospital reported two less staffed rooms than the previous year. In his Report, Mr. Zimmerman concluded that:
 "The number of staffed rooms in service at the hospitals and free-standing facilities in 1995 are sufficient to meet demand at present levels and to satisfy projected demand for 141 operating rooms through 1996. These data indicate that the staffed rooms are currently operating at 79 percent capacity in 1995. The implications are that by 1999, if no new facilities are added and utilization projections are met, staffed rooms would be operating at 82 percent capacity." Id. p. 6-7.
From this evidence, the 1995 decision concluded that "Mr. Zimmerman's report, Exhibit 95-60, shows a projected increase in outpatient operations through the period 1996 through 1999, aswell as a need for nine additional outpatient operating roomsduring the period 1996 through 1999." 1995 Report, p. 8 (emphasis in the original). Such a conclusion ignores the fact that, according to the Report, the number of staffed rooms in service are sufficient to meet demand through 1996, and that staffed rooms could meet projected need by increasing their operating capacity to 82 percent.
In response to St. Joseph's contention that there was a continuing surplus of "unstaffed operating rooms," the Department stated in its memorandum that "[s]ince Mr. Zimmerman did not consider unstaffed operating room in his statistics, it is totally inappropriate to claim that an unstaffed operating room is evidence of a "continuing surplus." Reply Memorandum of RhodeIsland Department of Health, p. 7. However, in response to the question: "So, to make an available room staffed, you would just have to add personnel; would you not?" Mr. Zimmerman responded: "You would have to at least add personnel. You might also have to add some equipment." Hearing Transcript, December 7, 1995, p. 54. Even if unstaffed operating rooms are not evidence of a continuing surplus, the closure of several operating rooms since 1994 certainly indicates that there still is a problem of excess capacity.
After a careful review of the record, this Court finds that the decisions of 1994 and 1995 are inconsistent. Rather than explain the inconsistencies, the director completely ignored the existence of the previous decision by stating that it was irrelevant. This Court is not satisfied that there is either a substantial and material difference between the decisions to justify the inconsistency or that there was even an attempt to provide a reasoned explanation for the Department's failure to adhere to its own, very recent, precedent. Furthermore, even when the Department did actually attempt to distinguish these decisions, it merely enumerated some factual differences and failed to explain the relevance of those differences. By ignoring its own precedent and issuing inconsistent decisions, the Department of Health failed to show that it acted in a wholly rational, logical fashion, completely free from even the appearance of bias, prejudice and improper influence.[25]
After a review of the entire record for the 1995 CON Application, the Court finds that the decision of the director to accept the Council's recommendation is not supported by reliable, probative and substantial evidence in the record and that the director's decision is arbitrary and capricious. Substantial rights of the appellants have been prejudiced. Accordingly, the Second Appeal, C.A. No. 97-1356, is granted and the director's decision is overturned.
[1] The first decision was made on December 3, 1994, by the Director at the time, Dr. Barbara DeBuono. The new Director, Dr. Patricia Nolan, made the second decision on June 14, 1996.
[2] St. Joseph Hospital Services of Rhode Island, Inc., d/b/a St. Joseph Hospital for Specialty Care and Our Lady of Fatima Hospital.
[3] Neither the governing statute nor the Rules and Regulations prohibit the filing of a subsequent Certificate of Need Application.
[4] A careful comparison of the 1994 and 1995 Reports reveals that many of the findings in the second report were identical to those in the first. Not only were these findings identical, but it appears that the Director actually quoted parts of the first decision verbatim. In addition to making some of the same findings that the first Director had previously deemed irrelevant and citing to the 1994 transcript, it appears that much of the testimony elicited in the 1995 hearings, and cited to in the 1995 Report, was merely a restatement of the testimony given in 1994.
[5] This assertion ignores the fact that most of the 1994 record was made part of the 1995 record.
[6] Superior Court Rule 42 (a) states:
 "When actions involving a common question of law or fact are pending before the court, . . . it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary cost or delay." Super. R. Civ. P. 42 (a).
[7] Section 4.3 (d) of the Rules and Regulations states:
 "A formal application shall contain the following information as a minimum, . . .
 (d) demonstration of a public need for the proposed new institutional health service and for the scope thereof at the time and place and under the circumstances proposed, considering the availability of existing facilities, equipment and services, both statewide and on a local basis, which may serve as alternatives or substitutes for the whole or any part of the proposed new institutional health service. . . ." R23-15-CON, Section 4.3(d).
Section 9.11 of the Rules and Regulations states in part:
 "The health services council shall analyze, as deemed appropriate, but shall not be limited to, the following considerations in conducting reviews:
 a) the relationship of the proposal to such state health plans as may be formulated by the state agency;
 b) the impact of approval or denial of the proposal on the future viability of the applicant and of the providers of health services to a significant portion of the population served or proposed to be served by the applicant;
 c) the need that the population to be served by the proposed . . . services has for the specific new institutional health service . ., and the scope thereof. . .;
 d) the availability of alternative, less costly, or more effective methods of providing such services. . . .;
 h) the immediate and long term financial feasibility of the proposal including:
 2) the probable impact of the proposal on the reimbursement system, on the cost of and charges for health services of the applicant and on the cost of health care in the state;
 i) the impact of the proposal on the quality of health care in the state and in the population area to be served by the applicant;
 r) improvements and innovations in the financing and delivery of health services which foster competition and serve to promote quality assurance and cost effectiveness. . . .;
 s) . . . the extent to which the proposed new service . . ., if implemented, will not result in any unnecessary duplication of existing services. . . .;
 x) and any other factors deemed relevant by the Health Services Council or the Director. R23-15-CON, Section 11.11
[8] (note, new Regs include Medicaid reimbursement as a consideration — Section 3.25).
[9] "At the conclusion of its review, the health services council shall recommend approval of only those proposals found to be affordable . . . ." R.I.G.L. § 23-15-4(3)(i).
[10] R.I.G.L. § 42-17.7-6(1) states:
 "After due consideration of the evidence and arguments, the hearing officer shall make written proposed findings of fact and proposed conclusions of law which shall be public when submitted to the director for review. The director may in his or her discretion adopt, modify or reject such findings of fact and/or conclusions of law provided, however, that any such modification or rejection of the proposed findings of fact or conclusions of law shall be in writing and shall state the rationale therefor."
[11] "If requested in writing by an affected person . . . a public meeting may be scheduled by the state agency to consider an application during the course of the review period." R23-15-CON, Section 10.1.
[12] "The public meeting shall be conducted by the adjudicative hearing officer of the state agency." R23-15-CON, Section 10.3(b).
[13] The Regulations, do not require members of the Council to attend the public hearings. This is evidenced by the fact that the Regulations require the agency to maintain verbatim records of the hearings and to make transcripts of those records available to the Council: "The agency shall maintain a verbatim record of the public meeting which shall be transcribed and made available to the Health Services Council." R23-15-CON, Section 10.3(d).
[14] There was testimony given by various parties on the issue of turnaround (or turnover) time. Turnaround time was variously described as "patient out — patient in" and "doctor out — doctor in." The former is the amount of time between a patient leaving an operating room and another patient entering; the latter refers to the amount of time between a doctor finishing the treatment of one patient and beginning the treatment of another patient.
[15] Like JASA, the general partner of Blackstone and Wayland is Columbia/HCA Healthcare. These outpatient ambulatory care facilities are located in Pawtucket and Providence, respectively.
[16] In 1994, the Council requested Harvey Zimmerman to compile a report on the "numbers of operations performed and the availability of surgical facilities from hospitals and free-standing facilities licensed to do invasive procedures.Exhibit 30, p. 1. The resulting Report is entitled "Need for Ambulatory Surgical Facilities in Rhode Island: Update."
[17] Table 1 Need for Operating Rooms in Rhode Island
Year Inpatient Needed Outpatient Needed Total Operations Inpatient ORs Operations Outpatient ORs Need
PROJECTED 1994 42,643 72 73,245 64 136 1995 42,138 71 75,754 66 137 1996 41,633 70 78,263 68 38 1997 41,128 69 80,771 71 140
[18] Table 3Protected Need for and Supply of Operating Rooms in Rhode Island, 1994-1997
Year Projected Projected Surplus/ ORs under Need for ORs Supply of ORs (Shortage) of ORs Construction
1994 136 143 7 1 1995 137 144 7 — 1996 138 144 6 — 1997 140 144 4 -
[19] At this point, it should be noted that the Council's 1995 Report makes numerous references to confidential material in order to justify its findings. However, a review of the sign out sheet indicates that not one member of the Council actually reviewed this information. The Department of Health defended this omission by stating that the director reviewed the confidential files herself and would have reached the same conclusions as the Council. Whether the director would have independently reached the same conclusions is irrelevant. The Council's ability to make findings from a record which it did not even review, gravely undermines the council's credibility and raises serious concerns about the possibility that the council may have committed improprieties.
[20] "Blackstone Valley is currently performing more complex cases which involve a longer period of duration and, therefore, not as many cases can be booked in any one day. Wayland, still in the start-up period (the first two years), is currently on budget for procedure and, in fact, in viewing a block a month at a time there are days for which no additional procedures can be booked. With respect to other hospitals providing outpatient services, as discussed in response to question 52(g). [sic] such hospitals cannot provide the services in the efficient and cost effective basis in which JASA will provide such services. Therefore, reference to overcrowding or excessive waiting times is irrelevant since the hospitals cannot provide the services proposed by JASA. The need for efficient and cost effective services, which will benefit the health care system in Rhode Island, will be provided by JASA. Exhibit 95-5, Q.61.
[21] After the sentence: "National trends in anticipated ambulatory surgery is expected to reach 60% or more by the year 2,000" JASA added "In Rhode Island that statistic has been met and will probably in all likelihood reach 70% or more by the year 2000." Exhibit 95-5, Q.37.
[22] Question 52, G, states: "However, JASA's services in the deicated [sic] outpatient setting result in more efficient and cost effective benefits to the patient and the health care system as confirmed by the majority of the Health Service Council findings adopted on November 28, 1994 in connection with the earlier Certificate of Need Application ("the 1994 CON"). Although certain hospitals provide outpatient surgery in a dedicated setting, hospital services are not able to compete with the efficient and cost effective manner in which JASA and its sister providers, Blackstone Valley Surgicare ("BVS") and Wayland Square Surgicare ("WSS"), provide services. This is documented in the Concil's [sic] findings adopted on November 28, 1994 based, in part, upon data submitted pursuant to the court order of confidentiality documenting the cost effective manner in which JASA provides services for which the hospitals cannot compete. Therefore, JASA's proposal will serve the interests of the patients in the State Rhode Island and the health care system itself by providing quality, efficient and cost effective services which other hospital providers are not able to match."Exhibit 95-5, Q.52.
Question 65 states: "As evidenced by the data submitted by JASA in the 1994 CON under seal, and as found by the Health Services Council in its report adopted in November 28, 1994, Medicare, Blue Cross and Blue Shield and United reimburse JASA at a lower rate of reimbursement than St. Joseph's, as an example of a hospital provider for identical procedures. Moreover, it is JASA's belief that its rate of reimbursement for identical procedures is lower than rates of reimbursement to all hospitals for identical procedures. Therefore, outpatient procerdures [sic] to be provided by JASA will provide significant cost savings to the health care system in the State of Rhode Island." Exhibit95-5, Q.65.
[23] Table 1 Need for Operating Rooms in Rhode Island
Year Inpatient Needed Outpatient Needed Total Operations Inpatient ORs Operations Outpatient ORs Need
ACTUAL 1994 39,944 67 75,432 66 133 1995 39,200 66 83,647 73 139 PROJECTED 1996 39,473 67 84,356 74 141 1997 38,525 65 87,894 77 142 1998 37,577 63 91,432 80 143 1999 36,629 62 94,970 83 145
[24] Table 3Protected Need for and Supply of Operating Rooms in Rhode Island, 1995-1999
Year Projected Projected Surplus/ ORs under Need for ORs Supply of ORs (Shortage) of ORs Construction
1995 139 141 2 1 1996 141 141 0 — 1997 143 141 (1) — 1998 145 141 (2) — 1999 145 141 (4) -
[25] Indeed, it might even be said that the second decision appears to be an effort by the agency to change the first decision and reach the opposite conclusion on substantially the same evidence prior to review by this Court. Such behavior erodes public confidence in the impartiality of the agency.